STATE OF NORTH CAROLINA v. WALTER WEDDINGTON

No. 346A90

(Filed 12 June 1991)

**1. Criminal Law § 496 (NCI4th) — testimony read during jury deliberations — no error**

The trial court in a first degree murder case did not err by permitting the complete testimony of the victim's daughter to be read to the jury during the course of its deliberations, since the entire jury was present during the foreman's request and the recitation of the testimony; the trial court stated three times that it was permitting the testimony to be read to the jury in the trial court's discretion; the court twice instructed the jury that it must remember and consider all of the evidence; the most damaging evidence against defendant was testimony concerning defendant's own statements and the physical evidence presented, not the testimony of the victim's daughter; and the court insured that defendant would not suffer any unfair prejudice when it had the testimony from both the direct and the cross-examinations of the witness read to the jury and properly instructed the jury to consider all the evidence presented. N.C.G.S. § 15A-1233(a).

**Am Jur 2d, Trial §§ 1025, 1041-1044.**

**2. Criminal Law § 868 (NCI4th) — jury request for instructions — more thorough instruction given than requested — no error**

The trial court did not err in failing to instruct the jury, in response to a juror's specific request for clarification, that the intent to kill essential to the offense of first degree murder must have existed at the time the act which caused death occurred, since the court determined that there was general confusion among the jurors about the elements of the crime charged and properly determined that repeating the pertinent portions of its instructions in their entirety would answer all the questions, and the trial court's additional instructions avoided giving undue prominence to any one of the questions or any part of the instructions. N.C.G.S. § 15A-1234.

**Am Jur 2d, Homicide §§ 496, 497, 499.**

## STATE v. WEDDINGTON

[329 N.C. 202 (1991)]

APPEAL of right pursuant to N.C.G.S. § 7A-27 from judgment entered by *Sitton, J.*, in the Superior Court, MECKLENBURG County, on 31 October 1989, sentencing the defendant to life imprisonment for murder in the first degree. Submitted on 12 February 1991 without oral argument, by motion of the parties, pursuant to Rule 30(d) of the North Carolina Rules of Appellate Procedure.

*Lacy H. Thornburg, Attorney General, by Isaac T. Avery, III, Special Deputy Attorney General, and Linda Anne Morris, Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Constance H. Everhart, Assistant Appellate Defender, for defendant-appellant.*

MITCHELL, Justice.

The defendant was tried upon a true bill of indictment charging him with the murder of Irma Smith. A jury found the defendant guilty of first degree murder. After a capital sentencing proceeding pursuant to N.C.G.S. § 15A-2000, the same jury recommended a sentence of life imprisonment. The trial court then entered judgment sentencing the defendant to life imprisonment, and the defendant appealed to this Court as a matter of right.

The defendant argues on appeal that the trial court erred by allowing the complete testimony of the State's key witness to be read to the jury during the course of its deliberations and by refusing to give certain jury instructions the defendant requested. We find no error.

The evidence adduced at trial tended to show that in August 1988, the defendant had been living with his girlfriend, Mary Barmore, for eight years. After meeting the victim, Irma Smith, who stated that she needed a place to live with her five children, the defendant agreed to allow her to live in one room of his house.

The State presented testimony from a Social Services worker and the victim's brother that Smith had been beaten badly during March of 1989. Her injuries included a "cauliflower" ear and a split earlobe.

The victim and her children lived at the defendant's home until 25 March 1989, when she came to the defendant's residence with two police officers in order to pick up her children. According to the officers, the victim was crying and had severe bruising

about her face and body. When the defendant came to the door, he said, "Move those goddamn police cars out of my driveway. Bitch, you brought the police here; you're a dead mother-f---er." He stated more than once that he was going to "kill that bitch." The officers were able to locate four of the victim's children and took them with the victim away from the defendant's house.

The victim was then taken to the magistrate's office, where a warrant was issued charging the defendant with assault. The defendant became aware of this assault charge prior to the victim's death. In addition, the defendant was the beneficiary of a life insurance policy insuring the life of the victim.

Kiki Smith, the victim's thirteen-year-old daughter, stated that on 15 April 1989, she was living with the defendant, her mother, three brothers and sisters, and Mary Barmore at the defendant's residence. On that day, she and her mother were in one room when the defendant arrived. The defendant called the victim into another room and an argument ensued. The defendant hit the victim with his fist, kicked her in the stomach and face, grabbed her by the hair, and threw her out the back door. Kiki heard two shots, after which the victim returned to the kitchen. The defendant began beating the victim again and took her back out of the house. Kiki heard two more shots and then heard no more sounds from her mother.

The defendant then dragged the victim's body into the house. He told Kiki and her brother to go to the store and buy some ammonia. When they returned, they ran water into the bathtub for the victim. Both the defendant and Barmore attempted to revive the victim. Finally, the defendant said, "I killed her, Mary; she's dead." He then put the victim in his car and left the residence.

At approximately 11:50 p.m., the defendant arrived at the emergency room of Charlotte Memorial Hospital. He told the security guard at the emergency room that the woman in the car had been shot and needed a nurse. The security guard observed that the victim had been shot in the right side of the head and was unconscious. After the security guard had called a nurse, the defendant returned to his car and left the hospital without identifying either himself or the victim. As he drove away, he passed a security guard who wrote down the vehicle's license tag number.

The nurse who examined the victim noticed a hole in the right side of her head and that her ear was missing. An emergency room physician also examined the victim. He noticed deep lacerations on her legs and arms, bruises to the upper parts of the body, and a large hole in her right ear. Her pupils were fixed and dilated, and her corneas were dry. The physician determined that the victim had been dead for two to four hours prior to the time she arrived at the hospital.

After leaving the hospital, the defendant went to the home of Doris and Erskine Thornwell. Ms. Thornwell had known the defendant for over twenty-five years. As the defendant arrived at the house, Mr. Thornwell was returning home from work. The defendant asked to speak with Ms. Thornwell. The defendant told the Thornwells, "I done killed Irma." He then showed them a gun, at which time Mr. Thornwell asked the defendant to leave. The Thornwells contacted the police shortly thereafter.

The defendant then went to Mattie Massey's home and had a drink with her boyfriend, Bert Potlow. The defendant told them, "I done killed that bitch; I done blowed her head off; I done blowed her brains out." He also told Massey, "I ought to blow your brains out." The defendant then showed them a gun, identifying it as the gun that he had "blowed the bitch's brains out with." The defendant then appeared to fall asleep or pass out, and Massey and Potlow left him in the house. They called the police, but the defendant had left by the time they returned to the house with the police.

Ultimately, the police located and arrested the defendant. A .38 caliber revolver was seized from the defendant's person, as well as a .25 caliber Baretta semi-automatic pistol. There were live rounds in the chamber of the .38 revolver, which was later determined to be the weapon used to kill the victim.

A search of the defendant's car revealed blood of the same type as the victim's. There was also blood on the front porch of the defendant's residence. Further, four spent casings, which had been fired from the defendant's .38 caliber revolver, were found at his home. In addition, a gunshot residue test indicated that the defendant had fired a gun recently.

The defendant contended that on the night the victim was killed, she engaged in a fight with a prostitute, which resulted

in bloody marks on the victim's face. After the fight, the victim went to the defendant's house. When the defendant saw the victim, he believed that she had been drinking, and he observed bruises on her forehead.

The victim then accompanied the defendant to a store. When they were returning from the store, they passed two prostitutes, and the victim became angry and began cursing. When the defendant stopped his car in front of his house, he reached under the front seat, pulled out a .38 caliber revolver and put it in his belt for protection as he left the car and entered his house. As the defendant got out of his vehicle, the victim got out of the car and yelled, "You should have let me kill the bitch." She approached the defendant and grabbed the gun from his belt. While they struggled, the defendant slipped, and the gun fired once. The victim fell to the ground. The defendant called for Mary Barmore to get a towel, and he wiped the victim's face. The victim was never taken back into the house.

The defendant decided to take the victim to the hospital. After arriving at the emergency room, the victim was taken inside. A security guard told the defendant to move his car. He moved the car to a parking lot and noticed he had lost his wallet. He then decided to return home to look for his wallet. On the way, he stopped at the Thornwells' house and told Doris Thornwell, "It's been an accident . . . Irma has gotten shot; I cannot believe . . . We was scuffling over a gun."

The defendant then went to Mattie Massey's house and told her boyfriend, Jimbo Potlow, that Irma had just gotten shot and that they had been struggling over a gun. He said that Potlow was intoxicated and that they had a drink together. Then for some reason, Massey and Potlow left the house, although the defendant remained. The defendant never showed a gun to Massey.

After leaving Massey's residence, the defendant returned home and asked Barmore if she had seen his wallet. He subsequently found the wallet in the yard.

Because he was unable to obtain any information about the victim's condition from the hospital, the defendant telephoned "Momma Gussey" Stanley, whom he thought of as his mother. He told her that there had been an accident and that he wanted her to go to the hospital with him because he could not learn

whether the victim was dead. As he left the house to go to Stanley's, he picked up the .25 caliber pistol which he was taking to her because she wanted it for protection. When he arrived at her house, the police arrested him and found the .25 automatic and the .38 revolver in his jacket pocket.

[1] In his first assignment of error, the defendant contends that the trial court erred by permitting the complete testimony of Kiki Smith to be read to the jury during the course of its deliberations. Specifically, he contends that this constituted an unbalanced presentation of part of the evidence.

After the jury retires for deliberation, the trial court is authorized, upon the jury's request, to allow requested parts of the testimony to be read to the jury. Our statute provides that:

> (a) If the jury after retiring for deliberation requests a review of certain testimony or other evidence, the jurors must be conducted to the courtroom. The judge in his discretion, after notice to the prosecutor and defendant, may direct that requested parts of the testimony be read to the jury and may permit the jury to reexamine in open court the requested materials admitted into evidence. In his discretion the judge may also have the jury review other evidence relating to the same factual issue so as not to give undue prominence to the evidence requested.

N.C.G.S. § 15A-1233(a) (1988). Whether to allow a jury's request that previously admitted testimony be read to it lies solely within the discretion of the trial court. *State v. Burgin*, 313 N.C. 404, 329 S.E.2d 653 (1985).

The statute, N.C.G.S. § 15A-1233(a), imposes two duties upon the trial court when it receives a request from the jury to review evidence. *State v. Ashe*, 314 N.C. 28, 34, 331 S.E.2d 652, 656 (1985). First, the trial court must have all jurors present in the courtroom. Second, the trial court must exercise its discretion in determining whether to permit the requested evidence to be read to the jury. *Id.; see State v. Lewis*, 321 N.C. 42, 361 S.E.2d 728 (1987).

The entire jury was present during the foreman's request and the recitation of the testimony. Therefore, there is no allegation that the court did not fulfill its first duty under N.C.G.S. § 15A-1233(a). In addition, the trial court three times stated that it was permitting the testimony to be read to the jury in the trial court's discretion.

STATE v. WEDDINGTON

[329 N.C. 202 (1991)]

Therefore, this case may be distinguished from those cases in which the trial court erroneously informed the jury that there was no procedure which permitted them to review testimony. *State v. Lang*, 301 N.C. 508, 272 S.E.2d 123 (1980). When the trial court states for the record that, in its discretion, it is allowing or denying a jury's request to review testimony, it is presumed that the trial court did so in accordance with N.C.G.S. § 15A-1233. *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988). In addition, the trial court must instruct the jury that it must remember and consider the rest of the evidence. *State v. Watkins*, 89 N.C. App. 599, 366 S.E.2d 876, *disc. rev. denied*, 323 N.C. 179, 373 S.E.2d 123 (1988).

Specifically, in response to the defendant's objection to the reading of Kiki Smith's testimony, the trial court stated: "Let the record show that WITHIN THE DISCRETION OF THE COURT, the Court OVERRULES THE OBJECTION and WITHIN THE DISCRETION OF THE COURT, permits the Court Reporter to re-read the testimony that is being requested be re-read by the jury." Then, with the entire jury and alternates present in the courtroom, the trial court told the jury:

> In regard to this request, Members of the jury, the Court, within its discretion, will ALLOW the testimony to be re-read to the jury. Before that is done, however, I instruct you that it is your duty, as jurors, to remember all of the testimony and all of the evidence.
>
> The fact that the Court has merely allowed you to hear a portion of the testimony, I will [sic] doing so, only in an effort to answer your request in regard to what you are seeking to hear.
>
> Again, you're to take all of the evidence into consideration in your deliberations.

At this point, the trial court reporter re-read several hours of Smith's testimony, on both direct and cross-examination.

At the conclusion of the reading and prior to the jury's resuming deliberations, the trial court again instructed the jury as follows: "Members of the jury, again, as I told you at the outset, the Court permitted that, within the Court's discretion, based upon your request. It is your duty to recall and consider all of the evidence in your deliberations." Therefore, the trial court properly instructed the jury in accordance with this Court's earlier decisions.

Alternatively, the defendant contends that even if the trial court exercised its discretion in permitting the jury to hear the requested testimony, it was an abuse of discretion so grossly prejudicial that it resulted in a violation of the defendant's constitutional rights. We disagree.

The fact that the trial court granted the jury's request that the testimony of a State's witness be read does not in and of itself constitute prejudicial error. *State v. Watkins*, 89 N.C. App. 599, 366 S.E.2d 876, *disc. rev. denied*, 323 N.C. 179, 373 S.E.2d 123 (1988). The defendant must show the trial court abused its discretion. To make the showing, the defendant must demonstrate that the trial court's action was "so arbitrary that it could not have been the result of a reasoned decision." *State v. Wilson*, 313 N.C. 516, 538, 330 S.E.2d 450, 465 (1985).

Here, the most damaging evidence against the defendant was testimony concerning the defendant's own statements and the physical evidence presented. The defendant's statements shortly before the killing that he would kill the victim and his statements after the killing that, "I done killed the bitch. I done blowed her head off; I done blowed her brains out" were clear statements of intent. The location of four shell casings from the defendant's gun negated his contention that there was one accidental shot. The victim's blood found on the defendant's front porch negated his assertion that he moved the victim from the ground near the car immediately into the car. Finally, the physical evidence of the fatal wound inside the victim's ear belies the defendant's contention of an accidental shooting. Smith's testimony was not the sole evidence upon which the State relied to support its case for first-degree murder. Therefore, any contention that the reading of Smith's testimony in and of itself constituted prejudicial error is feckless.

In addition, the trial court insured that the defendant would not suffer any unfair prejudice when it had the testimony from both the direct and the cross-examinations of Smith read to the jury and properly instructed the jury to consider all the evidence presented. Fully half of the testimony read was from the defendant's cross-examination. During cross-examination, Smith had been impeached with prior inconsistent statements, as well as by the defendant's questioning her ability to observe what she contended she saw on the day of the murder. No unfair prejudice to the defendant resulted from the trial court's having Smith's entire

testimony read to the jury. The trial court did not abuse its discretion, and this assignment of error is overruled.

[2] The defendant next assigns as error the trial court's failure to instruct the jury, in response to a juror's specific request for clarification, that the intent to kill essential to the offense of first degree murder must have existed at the time the act which caused death occurred. One juror asked: "Does intent (or intentionally) have to exist at the exact moment of the action?" At trial, the defendant agreed that reinstructing the jury on all the elements of the offense was adequate. The defendant now contends, however, that the trial court should have responded that "the specific intent to kill necessary to support a conviction of first-degree murder must exist ·at the time the offense is committed."

The instructions given were in conformity with the defendant's assent and are not error. *State v. Herring*, 322 N.C. 733, 370 S.E.2d 363 (1988). The defendant will not be heard to complain on appeal when the trial court has instructed adequately on the law and in a manner requested by the defendant. Further, once the jury retires for deliberation, the trial court may give appropriate additional instructions in response to an inquiry made by the jury in open court. N.C.G.S. § 15A-1234 (1988). When the trial court gives such additional instructions, it may also give or repeat other instructions to avoid giving undue prominence to the additional instructions. *Id.*

The trial court is in the best position to determine whether further instructions will be needed to prevent an undue emphasis being·placed on a particular portion of its instructions. *State v. Prevette*, 317 N.C. 148, 345 S.E.2d 159 (1986). The trial court is not required to frame its instructions with any greater particularity than is necessary to enable the jury to understand and apply the law to the evidence bearing upon the elements of the crime charged. *State v. Ward*, 300 N.C. 150, 266 S.E.2d 581 (1980).

Here, the questions asked the jurors indicated a general confusion about the elements of the crime charged, and the trial court properly determined that repeating the pertinent portions of its instructions in their entirety would answer all the questions. The trial court's additional instructions avoided giving undue prominence to any one of the questions or any part of the instructions. Therefore, the trial court did not err, and this assignment is without merit.

The defendant received a fair trial free of prejudicial error.

No error.