STATE OF NORTH CAROLINA v. CLINTON LAWRENCE JOHNSON

No. 84A94

(Filed 7 April 1995)

**1. Homicide § 372 (NCI4th)— first-degree murder—accessory before the fact—evidence that principal murdered victim—sufficient**

The trial court did not err by denying defendant's motion to dismiss charges of being an accessory before the fact where defendant contended that the State failed to produce evidence that the principal actually committed the murder, but sufficient evidence existed from which a jury could find that the principal was the one who burned the victims' home and thus murdered them.

**Am Jur 2d, Homicide § 445.**

**2. Evidence and Witnesses § 1235 (NCI4th)— accessory to first-degree murder—inculpatory statement—not a custodial interrogation**

The trial court did not err in a prosecution for being an accessory to first-degree murder by denying defendant's pre-trial

STATE v. JOHNSON

[340 N.C. 32 (1995)]

motion to suppress an inculpatory statement made to police offi-
cers the day after the fire in which the victims died where defend-
ant contended that the statement was obtained as the result of a
custodial interrogation without *Miranda* warnings, but the court
found that two deputies arrived at defendant's residence at about
7:15 a.m. the morning after the fire and asked defendant if he
would go to the jail to talk with them; defendant indicated that he
would and went to the jail with the officers after changing
clothes; defendant was advised prior to leaving his residence that
he was not under arrest and was allowed to drive his vehicle;
defendant was advised upon arriving at the jail that he was free to
leave and that he was not under arrest; defendant wrote out a
statement; a deputy indicated that defendant needed to talk to a
lieutenant and defendant agreed to stay in the breathalyzer room,
where he had written his statement; defendant was provided with
coffee at his request during the initial interview and remained in
the breathalyzer room by himself while the deputy talked to the
lieutenant; defendant agreed to wait to talk with the lieutenant,
eventually moving to another room because of cleaning in the
breathalyzer room; he was again advised that he was free to leave
and that he was not under arrest; he was provided with lunch and
any other requests; he did not attempt or request to leave the jail;
he was not threatened, harassed, or induced to give any state-
ments, nor promised anything in return for his statements; and
defendant was allowed to return to his own home at about 4:00
p.m. in his own vehicle.

**Am Jur 2d, Criminal Law §§ 793, 794; Evidence § 749.**

**What constitutes "custodial interrogation" within rule
of *Miranda v. Arizona* requiring that suspect be informed
of his federal constitutional rights before custodial inter-
rogation. 31 ALR3d 565.**

**3. Appeal and Error § 155 (NCI4th)— inculpatory state-
ments—only one objected to as hearsay—issue not pre-
served as to unobjected statements**

The question of whether all but one of defendant's inculpa-
tory statements contained inadmissible hearsay was not pre-
served for appeal in a murder prosecution where defendant
objected to only one of the statements. His motion to suppress
the entire statement was based solely on alleged *Miranda* viola-
tions and does not preserve the issue.

STATE v. JOHNSON

[340 N.C. 32 (1995)]

**Am Jur 2d, Appeal and Error §§ 545 et seq.**

4. **Evidence and Witnesses § 1113 (NCI4th)— conspiracy and accessory to murder—statement that coconspirator brought up killing victims—hearsay—admissible as party admission**

A statement in a prosecution for conspiracy and accessory to murder that the coconspirator brought up the discussions about killing the victims was hearsay, but was admissible under N.C.G.S. § 8C-1, Rule 801(a) as a party admission.

**Am Jur 2d, Evidence §§ 760 et seq.**

5. **Evidence and Witnesses § 2511 (NCI4th)— conspiracy to murder—statement made to officer not testifying—other officers not allowed to testify**

The trial court did not err in a prosecution for conspiracy and accessory to murder where defendant was not allowed to ask two officers about a statement defendant gave to another deputy. The evidence shows that neither of the officers questioned had personal knowledge of the statement made by defendant to the other officer. There was also no error in excluding questions concerning the knowledge of the officers of the statement because defendant was allowed to ask the officers essentially the same questions of which he now complains and because defendant failed to show the relevance of these particular questions.

**Am Jur 2d, Witnesses §§ 75, 76.**

6. **Evidence and Witnesses § 694 (NCI4th)— conspiracy and accessory to murder—questions as to setting fire—no offer of proof**

Defendant in a prosecution for conspiracy and accessory to murder failed to preserve the issue of whether the trial court erred by not allowing an SBI agent to answer defendant's questions concerning the fire which killed the victims by failing to make the required offer of proof.

**Am Jur 2d, Appeal and Error §§ 545 et seq.**

7. **Homicide § 582 (NCI4th)— accessory to murder—instructions—sufficient**

The trial court did not err in its instruction regarding first-degree murder by being an accessory before the fact where defendant contended that the court should have instructed the

jury that it had to find that the particular person involved, "April Barber," committed the offense rather than "another person" or "that other person." The trial court properly instructed the jury on the elements of first-degree murder by being an accessory and, because all of the evidence presented showed that April Barber was the person defendant allegedly advised, counseled, encouraged, procured, or aided, and there was no evidence that he aided any other person, the charge makes clear that the jury had to find the murders were committed by April Barber in order to convict defendant.

**Am Jur 2d, Homicide § 507.**

**8. Criminal Law § 1170 (NCI4th)— conspiracy to murder and conspiracy to commit arson—aggravating factors—involved a person under sixteen**

The trial court did not err when sentencing defendant for conspiracy to commit murder and arson by finding the aggravating factor that defendant involved a person under sixteen where the undisputed evidence shows that April Barber was fifteen years old; defendant discussed with her different ways to kill Mr. and Mrs. Barber and suggested insecticide for poisoning them; and defendant left gasoline in April's carport and told her the night of the fire that "tonight is as good as any. . . ." N.C.G.S. § 15A-1340.4(a)(1)(l).

**Am Jur 2d, Criminal Law §§ 598, 599.**

**9. Criminal Law § 1185 (NCI4th)— conspiracy to murder and conspiracy to commit arson—aggravating factors—prior convictions—driving while impaired**

The trial court did not err when sentencing defendant for conspiracy to commit murder and arson by finding the aggravating factor that defendant had prior convictions punishable by more than sixty days' confinement based on a certified copy of defendant's criminal record which showed that defendant was convicted of driving while impaired. N.C.G.S. § 15A-1340.4(e).

**Am Jur 2d, Criminal Law §§ 598, 599.**

**Court's right, in imposing sentence, to hear evidence of, or to consider, other offenses committed by defendant. 96 ALR2d 768.**

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from judgments imposing two sentences of life imprisonment entered by Beaty, J., at the 17 November 1992 Criminal Session of Superior Court, Wilkes County, upon a jury verdict of guilty of two counts of first-degree murder. Defendant's motion to bypass the Court of Appeals as to additional judgments imposed for conspiracy to commit first-degree murder and conspiracy to commit first-degree arson was allowed 25 February 1994. Heard in the Supreme Court 12 January 1995.

*Michael F. Easley, Attorney General, by Robert J. Blum, Special Deputy Attorney General, for the State.*

*Harry H. Harkins, Jr. for defendant-appellant.*

ORR, Justice.

On 16 September 1991, defendant was indicted for conspiracy to commit first-degree murder, conspiracy to commit first-degree arson, and two counts of first-degree murder by being an accessory before the fact. On 9 November 1992, defendant was also indicted for accessory before the fact to first-degree arson. Defendant was tried before a jury, and on 24 November 1992, the jury found defendant guilty of all charges. Following a capital sentencing proceeding, the jury recommended life sentences for the murder convictions. In accordance with the jury's recommendation, the trial court entered judgments sentencing defendant to two consecutive terms of life imprisonment for the murder convictions, followed by ten years' imprisonment for conspiracy to commit first-degree arson and twenty years' imprisonment for conspiracy to commit first-degree murder. The trial court arrested judgment on the arson conviction as the underlying felony which served as the basis for application of the felony murder rule.

On appeal, defendant brings forward numerous assignments of error. After a thorough review of the transcript of the proceedings, the record on appeal, the briefs, and oral arguments, we conclude that defendant received a fair trial free from prejudicial error, and, for the reasons set forth below, we therefore affirm his convictions and sentences.

At trial, the State's evidence tended to show the following: Martha Howell testified that in September 1991, her aunt and uncle, Lillie and Aaron Barber, lived in a brick house in Wilkes County, North Carolina, and that the Barbers' granddaughter, April Barber, lived with them. At

this time, Aaron Barber was eighty-three years old, Lillie Barber was seventy-seven years old, and April Barber was fifteen years old.

Howard Laney, a coroner affiliated with the Mulberry Fair Plains Fire Department, testified that on the night of 4 September 1991 he responded to a call concerning a fire at the Barbers' residence. Laney testified that when he arrived at the Barbers' residence, he found a woman lying face down approximately ten to twelve feet from the house. The injured woman was later identified as Lillie Barber. Laney testified that Mrs. Barber was "crying, saying she was hurting, and [that] her husband and granddaughter [were] in the house." Danny Gamble, chief of the Mulberry Fair Plains Fire Department, arrived on the scene shortly thereafter, and Laney informed him that there were two people in the house.

Chief Gamble testified that he and another fireman entered the house through the carport and that the house was filled with smoke and intense heat. Chief Gamble testified that during their search of the house, he and the other fireman found the body of a man lying face down in a bedroom. After carrying the man outside, Chief Gamble was able to identify him as Aaron Barber. Chief Gamble testified that although he knew that Mr. Barber "was black in color," "his whole body was white, like his whole body was blistered." Mr. Barber was taken to the hospital where he was pronounced dead in the emergency room. The firemen continued to search the house but never found any other bodies.

Chief Gamble also testified that after the fire was over, he observed April Barber standing "in an arm and arm position" with defendant outside the house next to the highway and that April did not look like she had been in the fire. Chief Gamble testified that he questioned April and that "as a result of the questions [he] asked her, [he] felt like something was wrong."

Mrs. Barber was admitted to Baptist Hospital on 5 September 1991. Dr. Meredith, the director of the Baptist Hospital Burn Unit, testified that Mrs. Barber arrived at the burn unit at approximately 1:30 a.m. Dr. Meredith observed that Mrs. Barber had second-degree burns on her arms, hands, chest, upper back, face, and one leg. Dr. Meredith testified that Mrs. Barber also sustained inhalation injury, an injury that occurs in the lungs from breathing smoke. Dr. Meredith further testified that this lung injury "reduces the ability of the lungs to transmit oxygen and carbon dioxide" and that the injury also "encourages infection in the lungs." Mrs. Barber died on 11 September 1991.

Patrick Langz, a Forsyth County medical examiner and pathologist, testified that in his opinion, based on the autopsy of Mr. Barber, Mr. Barber died of smoke and soot inhalation. Mr. Langz also testified as to the autopsy of Mrs. Barber. Mr. Langz testified that the autopsy revealed that Mrs. Barber "had a very severe pneumonia with areas of tissue destruction of the actual lung tissue caused by a specific type of bacteria" and that this pneumonia was a direct result of her burn injuries. Subsequently, Mr. Langz testified that in his opinion, "Mrs. Barber died of complications of her thermal injuries."

Agent Steve Cabe of the North Carolina State Bureau of Investigation ("SBI") talked with defendant at the Wilkes County Sheriff's Department on the morning of 5 September 1991, the day after the fire. At trial, Agent Cabe testified that defendant told him that he had met April Barber fourteen to fifteen months earlier at Wilkes Central High School and that he started dating April at this time. Agent Cabe testified that defendant told him that he and April started having sex approximately two months after they first began seeing each other and that April was fourteen years old then. Agent Cabe further testified that defendant stated

[t]hat there were some problems at April's home with her grandparents, and these problems became worse after April's mother Sheila Barber went to prison.

He stated that he became more aware of what was going on at the Barber residence, and that someone within the Barber family, or his family, was telling Mr. and Mrs. Barber about he and April seeing each other. That as [sic] it was as if everything they did was reported to Mr. and Mrs. Barber. That there were instances in which he and April went somewhere and did something and the Barber's [sic] seemed to find out about it in a very short length of time. . . .

That approximately six months ago [was] the first time that there was any discussion between he and April Barber about the Barber's [sic] being out of the picture. This discussion seemed to crop up out of the blue, so to speak. The discussion centered around the fact that he and April would be better off if the Barber's [sic] were out of the way. [Defendant] stated that April . . . [was] the one who brought up this discussion.

Subsequently, Agent Cabe testified that defendant told him that approximately three months prior to the fire, he and April discussed

a plan to shoot Mr. and Mrs. Barber. Defendant told Agent Cabe that April "got a gun which belonged to Mr. Barber and gave it to [defendant]." Defendant kept the gun for approximately two weeks. Defendant told Agent Cabe that the plan was for him to go over to the Barbers' residence to shoot them and that he did in fact go over to their residence and was going to shoot the Barbers but the Barbers were not at home. Defendant told Agent Cabe that when he discovered the Barbers were not home, he left the gun in April's purse. Defendant also told Agent Cabe that April was going to be at the residence but was not going to take part in the shooting.

Agent Cabe further testified that defendant told him that approximately one month after he left the gun in April's purse, April suggested to him poisoning Mr. and Mrs. Barber and that defendant told April "in a half joking manner" that he had seen some type of insecticide a few days earlier. Defendant also told Agent Cabe that after this discussion with April, "there was nothing left except for him to bring [April] the insecticide." When defendant brought the insecticide to April, they discovered it had a strong odor, and based on the fact the insecticide had a strong odor, defendant "figured that would be the end of that."

Agent Cabe further testified that defendant stated:

Approximately two weeks or so after this incident is when Mr. and Mrs. Barber began suspecting that April may be pregnant. A few days later there was some discussion about this and pressure being placed on April was getting to be intense. Mrs. Barber was talking to April about being pregnant by that white S.O.B.

[Defendant] stated that on Sunday night, September 1, 1991, there was a very bad argument between the Barbers and April about her being pregnant. April had told him that Mr. and Mrs. Barber were trying to get her to have an abortion. April refused to have an abortion. Mr. and Mrs. Barber then told her that when the baby was born they would kill it. [Defendant] stated that this must have been a very heated argument according to what April had told him. [Defendant] stated after the first time that the Barbers confronted April about being pregnant is when she mentioned burning the house. Stated that April was always fishing for an idea or some way of getting them off her back. [Defendant] stated that his ideas were to talk with a counselor or a minister. Stated he was just trying to get April's mind off of these other ideas. Stated that every time they tried to do something along the

counseling route or some similar discussion, it was as if they ran into a dead end.

Subsequently, Agent Cabe testified that defendant told him that approximately two weeks before the fire, he took a jug of gasoline to April's house. Defendant stated that he and April had discussed burning the house and that April told defendant to bring the gasoline over to the house at a certain time in the morning, which defendant did. Defendant told Agent Cabe that he took the gasoline over to April's house in a plastic milk jug at approximately 2:00 a.m. April was supposed to meet defendant at 2:30 a.m., but she did not. Defendant told Agent Cabe that he left the jug of gas in the carport at the Barbers' residence. The next day, April told defendant that she could not get out of the house the night before because her grandparents were watching her all night.

Agent Cabe further testified that defendant told him that he had spoken to April the afternoon and night of the fire. Defendant stated that "[t]here was some mention by April about burning the house" that night and that he "said to April that tonight is as good as any." Defendant told Agent Cabe that he did not think anything more about his discussion with April. Agent Cabe testified:

> [Defendant stated] that at some point in time [the night of the fire] April called him on the phone and told him that the house was on fire. [Defendant] stated he could not believe what he was hearing. Stated that he and April had talked about burning the house prior to [the night of the fire]. Stated they had talked about she was going to pour the gas and he was going to light it. Stated that this discussion had been held between he and April on more than one occasion. Stated he talked with April three times on the telephone [the night of the fire]. April did not really mention burning the house but on one occasion [that] night. [On] [t]his occasion [defendant] stated he told her that tonight is as good as any. [Defendant] stated that at no time did April tell him that she had burned the house . . . .

> . . . [Defendant] said, "I did every dumb thing in the world, and someone got hurt". [Defendant] said, "I realize what happened and what has happened".

Finally, Agent Cabe testified that on 5 September 1991, defendant was thirty years old.

Fire Marshall Kenneth Walters also testified at trial. Walters testified that he arrived at the Barbers' residence the night of the fire at 11:28 p.m. Upon entering the residence, Walters testified that he smelled gasoline. Walters observed a "pour pattern" on the carpet "where a liquid accelerant had been poured" and found a plastic container under the arm of the couch that smelled of gasoline. Walters testified that in his opinion, the fire had been intentionally set.

SBI Special Agent Rasmussen also investigated the fire at the Barbers' residence. Agent Rasmussen testified that he arrived at the residence on 5 September 1991 at about 2:15 p.m. Agent Rasmussen testified that he smelled gasoline in the living room and observed a "pour pattern" like Fire Marshall Walters had described. Agent Rasmussen testified that in his opinion, the fire was deliberately set by using a flammable liquid. Agent Rasmussen also sent carpet and linoleum samples from the house to the SBI laboratory for examination. SBI Forensic Chemist Larry Ford examined these samples and testified that he found residual gasoline on both the carpet and linoleum samples. Ford also testified that an accelerant "is anything that would increase or accelerate the burning of another material" and that common accelerants are petroleum products like gasoline, kerosene, fuel oil, and paint thinner.

·Defendant presented no evidence.

## I.

[1] First, defendant contends that the trial court erred in denying his motion to dismiss the charges of murder by being an accessory before the fact. We find no error.

In *State v. Davis*, 319 N.C. 620, 356 S.E.2d 340 (1987), this Court set forth the elements of accessory before the fact to murder as follows:

1) Defendant must have counseled, procured, commanded, encouraged, or aided the principal to murder the victim;

2) the principal must have murdered the victim; and

3) defendant must not have been present when the murder was committed.

*Id.* at 624, 356 S.E.2d at 342 (citing *State v. Sams*, 317 N.C. 230, 237, 345 S.E.2d 179, 184 (1986)) (other citations omitted). On appeal, defendant contends that the State failed to produce sufficient evi-

dence on the second prong, that the principal, April Barber, actually committed the murder. Defendant contends that although the State's evidence raises a strong suspicion of April Barber's guilt, "the State failed to offer substantial evidence that she was the one who burned the house."

"In determining whether evidence is sufficient to survive a motion to dismiss, the evidence is considered in the light most favorable to the State." *State v. Gray*, 337 N.C. 772, 777, 448 S.E.2d 794, 798 (1994) (citing *State v. Mason*, 336 N.C. 595, 597, 444 S.E.2d 169, 169 (1994)). "The test of the sufficiency of the evidence in a criminal case is whether there is substantial evidence of all elements of the offense charged so any rational trier of fact could find beyond a reasonable doubt that defendant committed the offense." *State v. Thompson*, 306 N.C. 526, 532, 294 S.E.2d 314, 318 (1982). " 'Substantial evidence' simply means 'that the evidence must be existing and real, not just seeming or imaginary.' " *State v. Sexton*, 336 N.C. 321, 361, 444 S.E.2d 879, 902 (quoting *State v. Powell*, 299 N.C. 95, 99, 261 S.E.2d 114, 117 (1980)), *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 429 (1994).

> The test of the sufficiency is the same whether the evidence is circumstantial or direct, or both: the evidence is sufficient to withstand a motion to dismiss and to take the case to the jury if there is "evidence [which tends] to prove the fact [or facts] in issue or which reasonably conduces to its conclusion as a fairly logical and legitimate deduction, and not merely such as raises a suspicion or conjecture." *State v. Johnson*, 199 N.C. 429, 431, 154 S.E. 730, 731 (1930).

*State v. Jones*, 303 N.C. 500, 504, 279 S.E.2d 835, 838 (1981) (alterations in original). Further, "[w]hether the evidence presented constitutes substantial evidence is a question of law for the trial court." *Sexton*, 336 N.C. at 361, 444 S.E.2d at 902.

In the present case, the evidence, viewed in the light most favorable to the State, tends to show that defendant and April Barber were involved in an intimate relationship to which April's grandparents, Lillie and Aaron Barber, were opposed. Subsequently, April and defendant discussed getting rid of the Barbers and how things would be better for them with the Barbers out of the way.

The evidence further tends to show that defendant and April planned to kill the Barbers by shooting them, that April procured a gun for defendant in order to shoot the Barbers, that defendant went

to the Barbers' residence to shoot Mr. and Mrs. Barber, and that defendant did not shoot them because they were not home at that time. After the failed attempt to shoot the Barbers, the evidence tends to show that April and defendant discussed poisoning them. Defendant delivered some insecticide to April for the purpose of poisoning Mr. and Mrs. Barber, but because of the insecticide's strong odor, defendant and April abandoned that plan.

Thereafter, Mr. and Mrs. Barber discovered that April might be pregnant and threatened to kill the child if April did not have an abortion. Following this discussion with her grandparents, the evidence tends to show that April suggested to defendant that they burn down the Barbers' residence in order to get rid of the Barbers. Defendant and April discussed burning down the Barbers' residence on more than one occasion, including a discussion that April would pour the gasoline and defendant would light it. In accordance with these discussions, the evidence further tends to show that defendant purchased some gasoline in a plastic container and two weeks prior to the fire, went to meet April at the Barbers' residence at 2:00 a.m. When April did not appear, defendant left the gasoline in the plastic container in the Barbers' carport.

The night of the fire, the evidence tends to show that April told defendant on the telephone that she "might as well burn the house down," and defendant responded, "tonight is as good as any." After the fire, investigators found a melted plastic jug smelling of gasoline under the arm of the couch in the living room and a pattern in the carpet where a liquid accelerant had been poured. The expert witnesses agreed that the fire had been intentionally set, and evidence from the autopsy revealed that Mr. and Mrs. Barber both died as a result of injuries from this fire. Based on our review of this evidence, we conclude sufficient evidence existed from which a jury could find that April Barber was the one who burned down the Barbers' home and thus murdered the victims. Defendant's first assignment of error is, therefore, without merit.

## II.

[2] Defendant next assigns as error the trial court's denial of his pretrial motion to suppress an inculpatory statement he made to police officers the day after the fire. In support of his contention, defendant asserts that his statement was obtained as a result of a custodial interrogation when defendant was not advised of his *Miranda* rights. We disagree.

STATE v. JOHNSON

[340 N.C. 32 (1995)]

"The rule of *Miranda* requiring that suspects be informed of their constitutional rights before being questioned by the police only applies to custodial interrogation." *State v. Brooks*, 337 N.C. 132, 143, 446 S.E.2d 579, 586 (1994) (citing *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694 (1966)). "Ordinarily, when a suspect is not in custody at the time he is questioned, any admissions or confessions made by him are admissible so long as they are made knowingly and voluntarily." *Id.* The test to determine whether a suspect is in custody is " 'an objective test of whether a reasonable person in the suspect's position would believe that he had been taken into custody or otherwise deprived of his freedom of action in any significant way or, to the contrary, would believe that he was free to go at will.' " *State v. Lane*, 334 N.C. 148, 154, 431 S.E.2d 7, 10 (1993) (quoting *State v. Phipps*, 331 N.C. 427, 442, 418 S.E.2d 178, 185 (1992)).

In the present case, the trial court held a *voir dire* and made extensive findings of fact concerning the interview in question. The trial court found that the morning after the fire, at approximately 7:15 a.m., Deputy Benfield and Deputy Wright of the Wilkes County Sheriff's Department arrived at defendant's residence and asked defendant if he would go to the jail to talk with them concerning the events in this case and that defendant "indicated that he would; that after he changed clothes, the [d]efendant came to the jail with the officers." The trial court found that prior to leaving his residence, defendant was advised that he was not under arrest for anything and that defendant was allowed to drive his vehicle to the jail.

Upon their arrival at the Wilkes County jail, defendant was taken to the breathalyzer room. The trial court found that at this time, defendant was advised that he was free to leave and again that he was not under arrest for anything. Thereafter, defendant proceeded to write out a statement concerning his knowledge of the events involved in this case. The trial court found that Deputy Benfield indicated that he needed to talk to Deputy Walsh, a lieutenant with the Wilkes County Sheriff's Department, and that defendant agreed to stay in the breathalyzer room.

During the initial interview, the trial court found that defendant was provided coffee at his request and that while the officer was gone to talk to Deputy Walsh, defendant remained in the breathalyzer room by himself. The trial court found that when Deputy Benfield returned, defendant was asked to talk with Deputy Walsh and that defendant indicated that he would talk with him and remain at the jail until

Deputy Walsh returned. At approximately 10:30 or 11:00 a.m., Deputy Walsh came in and indicated to defendant that he had talked with April Barber and that he still needed to talk to her further and asked defendant to stay.

Defendant stayed at the jail, eventually moving from the breathalyzer room into a separate room because of the cleaning that was going on in the breathalyzer room. The trial court found that the second time Deputy Walsh came back to talk with defendant, defendant was again advised that he was free to leave and that he was not under arrest. Additionally, the trial court found that later in the afternoon, when Deputy Walsh and SBI Agent Cabe talked with defendant, the officers again advised defendant that he was free to leave. Subsequently, the trial court found that defendant was provided some lunch "and any other requests that he might have had."

The trial court found that defendant did not attempt to leave, nor had he requested to leave the jail at any time prior to making a statement. The trial court also found that defendant indicated that he talked with Deputy Walsh and Agent Cabe and

> that during the course of the interviews from 7:30 until approximately four o'clock in the afternoon, the [d]efendant was not threatened or harrassed [sic], or induced in any manner to give any oral statements that he might have made, nor was he promised anything in exchange for his statements.

> The [d]efendant at all times was provided anything that he requested, and was reminded on several occasions that he was free to leave; that at approximately four o'clock the interview was completed, or concluded; that the [d]efendant, at that time, was not placed under arrest; that he was allowed to return to his home in his own vehicle; that no arrest was made at that time. The [d]efendant, later in the evening, around 7:30, was visited by Deputy Walsh and SBI Agent Cabe, and at that time, was arrested for the . . . charges presently against him.

> That the [d]efendant left unassisted at this time and returned to his residence . . . . The [c]ourt will find that the [d]efendant, at all times[] during the interview process from 7:30 to four o'clock had not been placed under arrest, nor had his freedom of movement or action been restricted in any manner; that on several occasions, while either Deputy Benfield . . . or Agent Cabe, and Deputy Walsh left the room, the [d]efendant was left unattended,

STATE v. JOHNSON

[340 N.C. 32 (1995)]

and had freedom of movement within the jail facility; the doors were not closed and left open.

Based on these findings, the trial court concluded that a reasonable person in defendant's position "would have felt that he was free to leave at will," that defendant's freedom was not restricted in any manner, and that defendant was not in custody at the time of his pre-arrest statements to law enforcement officers.

"The trial court's findings of fact following a *voir dire* hearing are binding on this [C]ourt when supported by competent evidence." *Lane*, 334 N.C. at 154, 431 S.E.2d at 10 (citing *State v. Mahaley*, 332 N.C. 583, 592, 423 S.E.2d 58, 64 (1992), *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 649 (1995)). The trial court's conclusions of law based upon its findings are, however, fully reviewable on appeal. *Id.*

Our review of the evidence shows that the trial court's findings were supported by competent evidence. Further, the trial court's conclusion that under these facts defendant did not undergo *custodial* interrogation for *Miranda* purposes during the interview in question was correct. *See Lane*, 334 N.C. 148, 431 S.E.2d 7 (defendant was not in custody when defendant was told he was free to leave on several occasions during the interview, defendant did not ask to leave and did not request an attorney, and defendant was not placed under arrest but was taken home by the SBI investigators); *Phipps*, 331 N.C. 427, 418 S.E.2d 178 (defendant not in custody when upon request he went to the police station on his own several times and answered questions, defendant was not placed under arrest but was permitted to return home, and defendant later agreed to take a polygraph test); *State v. Martin*, 294 N.C. 702, 242 S.E.2d 762 (1978) (defendant not in custody when he voluntarily went to the police station and made a statement while he was not under arrest and his freedom was not restricted, and police officers returned him to his home afterwards). Accordingly, we find no error.

## III.

[3] Defendant also assigns as error the admission of specific statements contained in defendant's statement to Agent Cabe and Deputy Walsh based on his contention that these statements constitute inadmissible hearsay. Our review of the record shows, however, that defendant failed to object to the admission of all but one of these statements at trial.

STATE v. JOHNSON

[340 N.C. 32 (1995)]

As discussed above, defendant filed a pretrial motion to suppress his entire statement to Agent Cabe and Deputy Walsh on the basis that defendant's statement was a product of a custodial interrogation in violation of *Miranda,* which motion the trial court denied based on its sole conclusion that *"Miranda* warnings were not required." Defendant objected and took exception to the trial court's ruling, and when asked by the trial court if there were anything further, defendant did not respond. At trial, Agent Cabe read defendant's statement into evidence.

On appeal, defendant assigns as error the admission of numerous statements contained in defendant's statement as inadmissible hearsay. Our review of the transcript shows, however, that defendant objected to the admission of only one statement contained in defendant's statement. Because defendant failed to object at trial to the admission of the remaining statements as inadmissible hearsay, the issue of whether these statements constituted inadmissible hearsay is not properly before us. N.C. R. App. P. 10(b)(1) ("In order to preserve a question for appellate review, a party must have presented to the trial court a timely request, objection or motion, *stating the specific grounds for the ruling the party desired the court to make . . . .")* (emphasis added).

Further, because defendant's motion to suppress defendant's entire statement was based solely on alleged *Miranda* violations and the trial court's denial of defendant's motion to suppress defendant's entire statement was based solely on its finding of no *Miranda* violation, defendant's objection to the trial court's ruling does not preserve for appellate review the question of whether these statements constitute inadmissible hearsay. *See State v. Eason,* 328 N.C. 409, 420, 402 S.E.2d 809, 814 (1991) ("This Court will not consider arguments based upon matters not presented to or adjudicated by the trial tribunal.").

[4] Thus, the sole question before us in this assignment of error is whether the one statement to which defendant objected at trial constitutes inadmissible hearsay. Without objection, Agent Cabe read from defendant's statement that defendant and April discussed the Barbers "being out of the picture" approximately six months prior to the fire, that the discussion seemed to "crop up out of the blue," and that the discussion centered on the fact that April and defendant would be better off if the Barbers were out of the way. Defendant timely objected to Agent Cabe's next statement that defendant stated "that April [was] the one who brought up this discussion."

Rule 801 of the North Carolina Rules of Evidence defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.C.G.S. § 8C-1, Rule 801(c) (1992). Under N.C.G.S. § 8C-1, Rule 801(a), "[a] 'statement' is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by him as an assertion." We conclude that defendant's statement that April was the one who brought up the discussions about killing the Barbers constitutes hearsay under N.C.G.S. § 8C-1, Rule 801(a), (c). We also conclude, however, that this statement was admissible under N.C.G.S. § 8C-1, Rule 801(d) as a party admission. Defendant's assignment of error is overruled.

## IV.

[5] Next, defendant contends that the trial court erred by not allowing defendant to ask Agent Cabe and Deputy Walsh about a statement defendant gave to Deputy Benfield at approximately 7:30 a.m. on 5 September 1991. Because the evidence shows that neither Agent Cabe nor Deputy Walsh had personal knowledge of the statement made by defendant to Deputy Benfield, we find no error.

It is well settled that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter." N.C.G.S. § 8C-1, Rule 602 (1992); see State v. Hester, 330 N.C. 547, 552, 411 S.E.2d 610, 613 (1992); State v. Hunt, 324 N.C. 343, 352, 378 S.E.2d 754, 759 (1989).

In the present case, it is undisputed that neither Agent Cabe nor Deputy Walsh was present when defendant was interviewed by Deputy Benfield. Further, on cross-examination when defendant attempted to question Agent Cabe and Deputy Walsh about the written statement given by defendant to Deputy Benfield, Agent Cabe testified that he had not seen the written statement previously, and Deputy Walsh testified that he could not identify the written statement. Accordingly, we conclude that the trial court properly excluded testimony by Agent Cabe and Deputy Walsh concerning defendant's statement to Deputy Benfield of which Agent Cabe and Deputy Walsh had no personal knowledge. Instead, we note that Deputy Benfield would have been the proper witness to testify concerning the statement defendant gave to him; defendant did not, however, call Deputy Benfield as a witness.

Defendant additionally argues that he should have been allowed to ask Agent Cabe if he were aware that the statement existed or if he knew that defendant had spoken to Deputy Benfield and to ask Deputy Walsh if he were present when Deputy Benfield testified at the suppression hearing and whether Deputy Benfield told Deputy Walsh defendant had given him a statement. Our review of the transcript shows, however, that defendant was in fact permitted to ask Agent Cabe if he "later became aware of the fact that before [defendant] talked to [Agent Cabe] he talked to [Deputy] Benfield" and whether before defendant started talking to Agent Cabe, defendant told Agent Cabe that he had already given Deputy Benfield his statement. Further, on re-cross, defendant was permitted to ask Deputy Walsh if he were present at pretrial motions when Deputy Benfield testified concerning the statement in question.

Thus, defendant was allowed to ask Agent Cabe and Deputy Walsh essentially the same questions of which he now complains. In light of this fact and in light of our holding that Agent Cabe and Deputy Walsh could not testify to the substance of the statement given to Deputy Benfield, defendant has failed to show the relevance of these particular questions or any error in their exclusion. N.C.G.S. § 8C-1, Rules 401, 402 (1992). Accordingly, we find no error.

## V.

[6] Defendant also contends that the trial court erred by not allowing SBI Agent Rasmussen to answer defendant's questions as to whether the fire could have been set by one person. Defendant has failed, however, to preserve this issue for appellate review.

"It is well established that an exception to the exclusion of evidence cannot be sustained where the record fails to show what the witness' testimony would have been had he been permitted to testify." *State v. Simpson*, 314 N.C. 359, 370, 334 S.E.2d 53, 60 (1985) (citing *State v. Cheek*, 307 N.C. 552, 299 S.E.2d 633 (1983)). "[I]n order for a party to preserve for appellate review the exclusion of evidence, the significance of the excluded evidence must be made to appear in the record and a specific offer of proof is required unless the significance of the evidence is obvious from the record." *Id.* at 370, 334 S.E.2d at 60 (citing *Currence v. Hardin*, 296 N.C. 95, 249 S.E.2d 387 (1978)).

In the present case, Agent Rasmussen testified as an expert in the field of fire investigation. On direct examination, Agent Rasmussen testified that in his opinion the fire was deliberately set. On cross-

examination, the trial court sustained the State's objections to defendant's attempts to ask Agent Rasmussen if in his opinion it would have been possible for this fire to be deliberately set by one person. On appeal, defendant contends the trial court erred in sustaining the State's objections because "[t]his deprived defendant of evidence which may have raised a reasonable doubt as to April Barber's guilt, or [defendant's] complicity." Defendant failed, however, to make the required offer of proof to show what Agent Rasmussen's testimony would have been if he had been allowed to answer defendant's questions. We are, therefore, unable to determine whether the exclusion of this testimony was prejudicial. *See id.* at 371, 334 S.E.2d at 61. Defendant's assignment of error is overruled.

## VI.

[7] Defendant's next assignment of error relates to the trial court's jury instruction regarding first-degree murder by being an accessory before the fact. The pertinent portion of the charge states:

So, finally as to the charge of first degree murder . . . I instruct you as follows as it applies to the theory of aiding and abetting, counseling, advising, encouraging or procuring another that if you find from the evidence beyond a reasonable doubt that on or about September 4, 1991, some person other than the [d]efendant committed the crime of first degree murder, that is that the other person committed first degree murder on the basis of either malice, premeditation and deliberation, or on the basis of the felony—first degree felony murder rule, and if you find from the evidence beyond a reasonable doubt that the [d]efendant knowingly advised, counseled, encouraged, procured or aided the other person to commit the crime of first degree murder on either the basis of malice, premeditation and deliberation, or on the basis of the theory of first degree felony murder, and that in doing so the [d]efendant's actions or statements caused or contributed to the commission of the crime of first degree murder involving the—or first degree murder as to either Aaron Barber or Lillie Barber by the other person, it would be your duty to return a verdict of guilty of first degree murder.

On appeal, defendant contends that the trial court erred in denying his motion at the end of the charge to instruct the jury that it had to find that "April Barber" committed the offense instead of using the terms "another person" or "that other person." Defendant cites no support for his contention, but argues that "since the court only

instructed [the jury] that they had to find that 'another person' did the burning, they might well have convicted defendant despite harboring a reasonable doubt as to April Barber's complicity." We find no merit in defendant's argument.

The trial court properly instructed the jury on the elements of first-degree murder by being an accessory before the fact. *See* N.C.P.I.—Crim. 202.20A (1989); s*ee also Davis,* 319 N.C. at 624, 356 S.E.2d at 342 (listing elements for murder by being an accessory before the fact). "The trial court is not required to instruct the jury 'with any greater particularity than is necessary to enable the jury to understand and apply the law to the evidence bearing upon the elements of the crime charged.' " *State v. Barton,* 335 N.C. 696, 707, 441 S.E.2d 295, 300-01 (1994) (quoting *State v. Weddington,* 329 N.C. 202, 210, 404 S.E.2d 671, 677 (1991), *cert. denied,* —— U.S. ——, 124 L. Ed. 2d 283 (1993)).

Further, the charge in the present case makes clear that the person who committed the murder had to be the same person defendant "knowingly advised, counseled, encouraged, procured or aided." Thus, because all of the evidence presented showed that April Barber was the person defendant allegedly advised, counseled, encouraged, procured, or aided and because there was no evidence that defendant advised, counseled, encouraged, procured, or aided any other person, the charge makes clear that the jury had to find the murders were committed by April Barber in order to convict defendant. We find no error.

## VII.

[8] Finally, defendant contends that the trial court erred in finding two aggravating factors when sentencing defendant on the noncapital felonies of conspiracy to commit murder and conspiracy to commit arson. Because we find the evidence was sufficient to support the trial court's findings as to both aggravating factors, we find no error.

"The Fair Sentencing Act did not remove all discretion from our trial judges. It is necessary that trial judges be permitted great latitude in ascertaining the true existence of aggravating and mitigating circumstances." *State v. Graham,* 309 N.C. 587, 592, 308 S.E.2d 311, 315 (1983). In the present case, the trial court found as factors in aggravation that defendant involved a person under the age of sixteen in the commission of the crime and that defendant had a prior con-

viction or convictions for criminal offenses punishable by more than sixty days' confinement.

The undisputed evidence shows that at the time the crimes were committed, April Barber was fifteen years old. Further, the evidence tends to show that defendant discussed with April different ways to kill Mr. and Mrs. Barber and even suggested insecticide to April for poisoning them. The evidence also tends to show that defendant left gasoline in April's carport for her and told her the night of the fire, "tonight is as good as any [to burn down the Barbers' home.]" We find this evidence sufficient to support a finding as a factor in aggravation that defendant involved a person under the age of sixteen in the commission of the crime. *See* N.C.G.S. § 15A-1340.4(a)(1)(l) (1988) (repealed effective 1 October 1994).

[9] Additionally, we find sufficient evidence to support the finding that defendant had prior criminal convictions punishable by more than sixty days' confinement. At the sentencing hearing, Agent Cabe identified and read into evidence a certified copy of defendant's criminal record which showed that on 18 March 1989, defendant was convicted of driving while impaired. Certified copies of court records are a proper method for proving prior convictions. N.C.G.S. § 15A-1340.4(e). Further, "a conviction of driving while impaired under G.S. 20-138.1, irrespective of the level of punishment imposed, constitutes a prior conviction of an offense punishable by more than sixty days' imprisonment for purposes of sentencing under the Fair Sentencing Act." *State v. Santon,* 101 N.C. App. 710, 712, 401 S.E.2d 117, 118 (1991). Accordingly, we find no error.

NO ERROR.