STATE OF NORTH CAROLINA v. ANTHONY JEROME HIPPS

No. 272A96

(Filed 9 July 1998)

**1. Jury § 227 (NCI4th)— jury selection—death penalty views—excusal for cause**

The trial court did not err during jury selection in a capital first-degree murder prosecution by excusing for cause two prospective jurors where one juror's responses indicated that she could not return a verdict of death under any circumstances and

any equivocation reflected only her desire to abide by her oath and follow the law and not an actual ability to sentence defendant to death if the law required it; and the other juror's responses likewise clearly indicated that his views on the death penalty would impair his ability to act as a juror and that he could not return a verdict of death, and he also had other impediments to serving as an impartial juror. Furthermore, there was no error in not allowing the defense the opportunity to rehabilitate.

**2. Evidence and Witnesses § 876 (NCI4th)— murder victim— statements that she feared defendant—admissible**

There was no prejudicial error in a capital first-degree murder prosecution in the admission of statements from the victim to three witnesses that she was afraid of defendant and that he might kill her. Evidence tending to show the state of mind of a victim is admissible as long as the declarant's state of mind is a relevant issue and the potential for unfair prejudice in admitting the evidence does not substantially outweigh its value. It has consistently been held that a murder victim's statements that she fears the defendant and fears that the defendant might kill her are statements of the victim's then-existing state of mind and are highly relevant to show the status of the victim's relationship to the defendant. Whether the probative value of the victim's statements is substantially outweighed by the danger of unfair prejudice to defendant is a matter left solely in the discretion of the trial judge, and this defendant was not able to show that the trial court abused its discretion. N.C.G.S. § 8C-1, Rule 803 (3).

**3. Evidence and Witnesses § 735 (NCI4th)— first-degree murder—statement by victim—defendant had beaten her— admission not prejudicial**

There was no prejudicial error in a capital first-degree murder prosecution by admitting the victim's statements to a witness that defendant had beaten her and given her the bruises and knots on her head. Even assuming that the court erred in allowing the testimony, the evidence was overwhelming that defendant killed the victim.

**4. Evidence and Witnesses § 1235 (NCI4th)— first-degree murder—police search for victim—defendant as bystander—questions not custodial**

The trial court did not err in a capital prosecution for first-degree murder by admitting a statement made by defendant to

police when they were looking for the missing victim. While officers were searching for the victim, an officer saw defendant, approached him, and asked if had seen the victim; defendant responded that he had not seen her since the week before; the officer told defendant that the police had information that defendant had killed the victim, that they needed to know if defendant had not killed her and she was alive, and that they had enough to arrest defendant if they found the victim dead; defendant stated that he would bring the victim to the police if he saw her; and the officer left defendant standing there as the police continued their search. Although defendant contends that the statement should have been suppressed because he was not advised of his rights, the record reveals that defendant's freedom to leave was in no way hampered and that a reasonable person in defendant's position would not have thought that he was in custody. *Miranda* is not implicated by this noncustodial encounter.

**5. Evidence and Witnesses § 1238 (NCI4th)— first-degree murder—officers called to disturbance—statements by defendant about prior murder—not custodial**

The trial court did not err in a capital first-degree murder prosecution by admitting defendant's statements to the police where an officer responded to a call about a disturbance at a store possibly involving defendant; the officer saw defendant standing outside the store and asked what was going on; before he got the words out, defendant put his hands on the police car and said, "Go ahead and take me. I did it"; the officer backed defendant off the vehicle and asked what he was talking about; defendant said, "I did it. Me and Rock"; the officer heard defendant mumble something about Shelia; the officer had been searching for Shelia Wall all morning pursuant to a missing person report; the officer testified that at this point he thought the victim was going to walk out and that everything would be cleared up; the officer asked defendant where Shelia was; and defendant responded that they had killed her and that she was under the bridge. A reasonable person in defendant's position would not have thought he was in custody at the time he made the statement and the questions put to defendant at the store do not constitute interrogation for *Miranda* purposes. What happened after the statement was made does not affect the noncustodial and voluntary nature of the encounter prior to and while the statement was being made. Since no *Miranda* violation occurred, there was

no error on this basis in the admission of subsequent statements at the detention center.

**6. Evidence and Witnesses § 1274 (NCI4th)— first-degree murder—statement by defendant—waiver of rights—low IQ and impaired reading skills**

The trial court did not err in a capital first-degree murder prosecution by admitting statements given by defendant to officers where defendant contended that the statements should have been suppressed because his low IQ and impaired reading and spelling skills rendered him unable to understand and knowingly waive his rights. The court was cognizant of defendant's limited intellectual and reading abilities and conducted extensive inquiry into the procedure used in obtaining defendant's waivers and statements. The trial court's conclusions are further buttressed by evidence presented that defendant was familiar with his constitutional rights and the legal process based on his involvement with police in his earlier murder conviction.

**7. Criminal Law § 103 (NCI4th Rev.)— first-degree murder— discovery—defendant's oral and written statements—oral statement provided in summary—variation in terminology**

The trial court did not abuse its discretion in a capital first-degree murder prosecution by denying defendant's motion to suppress an oral statement made to officers on the ground that the State failed to provide the statement during discovery where the State provided a copy of defendant's written statement and a summary of his oral statement which indicated that it was substantially similar, but defendant in his written statement described the wooden object used to strike the victim as a "stick" and counsel first heard testimony on voir dire which described the object as a "board." There was no discovery violation; whatever term defendant used in his oral statement to describe the implement is immaterial in light of the fact that the object was identified at the scene of the crime, collected by investigators, studied by crime-scene specialists, introduced into evidence, and placed before the jury. Whether defendant called it a "stick," "board," or another of the terms used at various points prior to the *voir dire* is of little consequence. Even if there had been a discovery violation, the trial court provided the defense with a recess to examine the object, but defendant specifically declined the full use of the recess and asked merely to look at the notes from which the officer testified.

STATE v. HIPPS

[348 N.C. 377 (1998)]

8. **Evidence and Witnesses §§ 327, 337 (NCI4th)— first-degree murder—prior murder—admissible to show knowledge and intent**

The trial court did not err in a capital first-degree murder prosecution by admitting evidence of defendant's 1978 conviction for second-degree murder where the evidence of the prior crime is highly probative of defendant's knowledge that his actions would likely kill this victim and that he intended to kill this victim. The time lapse between the crimes goes to the weight of the evidence, not to its admissibility, and the trial court was aware of the danger of unfair prejudice and gave a proper limiting instruction.

9. **Criminal Law § 1336 (NCI4th Rev.)— capital sentencing—impaired capacity—objection to defendant's question sustained—no offer of proof and no prejudice**

The trial court did not err in a capital sentencing proceeding by sustaining the prosecution's objection to a question to defendant's expert in forensic psychology where the expert opined that defendant's limited intellectual functioning and any substance abuse constituted diagnosable mental disturbances, defense counsel attempted to ask whether defendant would have the capacity to appreciate the criminality of his conduct and conform to the requirements of the law as with most of the population, the prosecutor's objection was sustained, and defense counsel did not rephrase the question or make an offer of proof. A defendant must make an offer of proof in order to preserve the exclusion of evidence for appellate review; moreover, the jury had before it evidence from which it could have concluded that defendant's capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law was impaired.

10. **Evidence and Witnesses § 2787 (NCI4th)— capital sentencing—cross-examination of defense expert—prosecutor's opinion**

The trial court did not err in a capital sentencing proceeding by overruling defendant's objections to the manner in which the prosecutor cross-examined defendant's expert witness. Although defendant contends that the prosecutor was allowed to place before the jury the opinion that defendant was only acting "crazy" and was lying on personality tests, the questions were well within the bounds of proper cross-examination of an expert witness.

**11. Criminal Law § 1371 (NCI4th Rev.)— capital sentencing— aggravating circumstance—especially heinous, atrocious, or cruel—properly submitted**

The trial court did not err in a capital sentencing proceeding by submitting to the jury the especially heinous, atrocious or cruel aggravating circumstance where defendant stabbed the victim at least thirty-four times, primarily on her back, but also on the front of her body and her head, the wounds to the head penetrated the skull, two wounds pierced the left lung, three pierced the right lung, one penetrated the aorta and caused extensive bleeding, indicating that the victim's heart was still beating while she was being stabbed, she also suffered a fracture at the base of her skull from a blow or blows to the head with a piece of wood, the evidence suggested that at least some of the stab wounds were inflicted prior to the blow to the head, a defensive wound suggests that the victim was conscious and aware of what was happening, and death was caused by the stab wounds. This evidence supports the conclusion that the victim's death was physically agonizing, conscienceless, pitiless, and unnecessarily torturous and that the victim was aware of but helpless to prevent her impending death. N.C.G.S. § 15A-2000(e)(9).

**12. Criminal Law § 461 (NCI4th Rev.)— capital sentencing— prosecutor's argument—death penalty as deterrent for this defendant**

There was no plain error in a capital sentencing proceeding where the trial court did not intervene *ex mero motu* when the prosecutor argued that prison had been tried and didn't work. Although defendant argued that this was analogous to the argument that the jury should impose a standard of conduct and send a general message of deterrence to others who may commit crimes, the prosecutor properly and permissibly argued that the jury should impose the death penalty to foreclose further crimes by defendant specifically.

**13. Criminal Law § 460 (NCI4th Rev.)— capital sentencing— prosecutor's argument—death warranted by facts of case**

There was no plain error in a capital sentencing proceeding where the trial court failed to intervene *ex mero motu* when the prosecutor argued that "the law requires that you return a jury recommendation of death in this case." In context, the prosecutor was properly arguing that the recommendation of death was warranted by the facts and circumstances of the case.

**14. Criminal Law § 1402 (NCI4th Rev.)— death penalty—not disproportionate**

A sentence of death was not disproportionate where the aggravating circumstances were supported by the evidence, nothing in the record suggests that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor, and this case is more similar to cases in which the death sentence was found proportionate than to those in which it was found disproportionate or those in which juries consistently returned recommendations of life imprisonment.

Justice WEBB concurring in the result.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Helms (William H.), J., at the 13 May 1996 Criminal Session of Superior Court, Rowan County, upon a jury verdict of guilty of first-degree murder. Heard in the Supreme Court 9 March 1998.

*Michael F. Easley, Attorney General, by Tiare B. Smiley, Special Deputy Attorney General, for the State.*

*Lisa S. Costner for defendant-appellant.*

PARKER, Justice.

Defendant was indicted 4 December 1995 for the first-degree murder of Shelia Dianne Wall[1] on 3 November 1995. In May 1996 he was tried capitally and found guilty of first-degree murder. Following a capital sentencing proceeding, the jury recommended a sentence of death; and the trial court entered judgment accordingly. For the reasons discussed herein, we conclude that the jury selection, the guilt-innocence phase, and the capital sentencing proceeding of defendant's trial were free from prejudicial error and that the death sentence is not disproportionate.

The State's evidence at trial tended to show that the victim, Shelia Dianne Wall, met defendant, Anthony Jerome Hipps, in December of 1994 after which the two began seeing each other and spending time together. The victim would frequently spend the night with defendant in the front room of the apartment he shared with his

---

1. Throughout the transcript and the briefs, the victim's name is also spelled "Sheila." Having no way to know which spelling is correct, we have elected to use "Shelia," which is the spelling in the indictment.

nephew, Rock Sturdivant. Various witnesses testified that they began to notice bruises on the victim and knots and bumps on her head beginning in the summer of 1995 and continuing from that time until the time of her death. Defendant drank frequently and physically abused the victim. The victim confided to a friend in August that she was afraid of defendant, that things were getting worse, and that she was afraid defendant might kill her.

On Thursday, 2 November 1995, at around 9:00 p.m., defendant and the victim were seen arguing loudly outside the Spencer Country Cupboard. The last time the victim was seen alive by her family she and defendant were walking down the road with defendant walking behind the victim.

The next day, Friday, 3 November 1995, defendant's nephew, Sturdivant, ran into defendant in East Spencer. Defendant was acting wildly and grabbed Sturdivant and told him that he had killed his girl-friend, offering to show Sturdivant the body as proof that he was not lying to him. They were near the railroad tracks by Burdette Bridge, and defendant told Sturdivant that the body was nearby. Sturdivant got upset and frightened and left after telling defendant he did not want to see the body.

On Saturday, 4 November 1995, Sturdivant went to see the victim's family to tell them that someone told him that defendant had killed the victim. The family did not know whether to believe him. They filed a missing-person report, and the police began a search for the victim.

The next day, Sunday, 5 November 1995, fearful that his relationship with defendant would cause him to be linked to the killing, Sturdivant, on his sister's advice, went to the Spencer Police Department. Sturdivant told the police what defendant had told him about killing the victim. The police then began looking for defendant and put the word out to his friends that they wanted to talk to him.

On Wednesday, 8 November 1995, defendant went to the Spencer Police Department to be interviewed. Defendant was not under arrest at this time, but he was read his rights and signed a waiver. He gave a statement to the officers that he did not know where the victim was and that he had last seen her on Friday, 3 November 1995. Defendant was then released.

The police continued searching for the victim in the woods north of Burdette Bridge. While searching on Friday, 10 November 1995,

Officer G.S. Henline saw defendant standing beside the railroad tracks near the bridge. Defendant was drinking beer and looking at Henline and laughing. Henline approached defendant to find out what was funny. Henline explained to defendant that they were searching for Shelia Wall and that if he knew something, he should let them know, but that if he did not, he should not get in the way. Defendant responded, "Yes, sir"; and after some more words were exchanged, Sergeant Henline walked away. Later, Officer George Wilhelm saw defendant by the tracks and spoke with him, telling him they were searching for Shelia Wall and asking defendant if he had seen her. Defendant responded that he had not seen her since Friday the week before, just as he had stated in his earlier statement to police on 8 November. Wilhelm told defendant that they had information that Ms. Wall had been killed and that defendant was the one who killed her. Wilhelm further told defendant that if the police found her body, they had enough evidence to arrest him for her murder; so if she was alive, defendant needed to let them know. Defendant responded that if he saw her, he would bring her to the police. Wilhelm then left defendant and continued searching.

Later that same day while on a break from the search, the officers received a call about a disturbance nearby at Real's Variety store. When Sergeant Henline arrived at the store, he saw defendant standing outside and asked him what was going on. Defendant immediately said, "Go ahead and take me. I did it," and came up and put both hands on the hood of the police car. Henline asked defendant what he was talking about; and defendant said, "I did it. Me and Rock." Henline again asked what he was talking about, and defendant responded that he and Sturdivant had killed Shelia Wall and that her body was under the bridge.

Henline was not sure whether to believe defendant but radioed Sergeant Wilhelm to meet them at Burdette Bridge. Henline and defendant then got in the front seat of the police car and drove to the bridge. Defendant had not been placed under arrest and was not handcuffed. Defendant told Henline the victim was not under the bridge itself, but under some trees. They got out of the car and were joined by Sergeant Wilhelm. Defendant met Wilhelm in front of the car and said, "I wanted to tell you [a] while ago, but I couldn't. I want to take you where Shelia is." Wilhelm put his hand up and reminded defendant of the rights he had read him on the previous Wednesday, 8 November, and told him he did not have to tell them anything. Defendant replied that he knew his rights and wanted to show them

where the victim's body was. Defendant then took Wilhelm by the hand and walked him over to a brush pile and pointed and said, "There she is, there's Shelia." The victim's body was hidden with leaves and branches broken from nearby trees. Wilhelm then told defendant not to tell him anything until he could inform him of his rights again; he took defendant back to his patrol car where he kept a rights card and read defendant his rights. Defendant said he understood and waived his rights. Defendant then gave a statement in which he said that Sturdivant attacked the victim with a knife while the three of them were walking on the path and that when the victim ran to defendant for help, defendant saw the blood and panicked and started hitting her in the head with a stick. Defendant then took the officers back and showed them the location on the path where the incident took place, about two hundred yards from where he had dragged the body to hide it. He pointed out the piece of lumber with which he had struck the victim.

Defendant was then taken to the Spencer Police Department, where he was advised of his rights again and given a written waiver to sign. He repeated his statement confessing to the murder and implicating Sturdivant. Sergeant Wilhelm wrote the statement down line by line, reading it back to defendant after each line; and defendant signed it. Defendant and Sturdivant were then arrested for murder.

Sturdivant allowed the police to search his apartment and told the police that all he knew about the killing was what defendant had told him when he ran into defendant on 3 November, namely, that defendant had killed the victim and that her body was somewhere around the bridge.

On Sunday, 12 November 1995, Sergeant Wilhelm was puzzled by the details of defendant's 10 November statements about how the crime occurred. He reinterviewed defendant, again advising him of his rights. Defendant acknowledged he understood his rights and signed a waiver. Wilhelm again wrote out defendant's statement line by line, and defendant signed it. In this statement defendant confessed that he alone killed the victim after they had gotten into an argument behind the Country Cupboard on Thursday, 2 November 1995. Defendant stated that he and the victim were on the path and began to argue and fight and that he hit her and began to stab her. He covered up her body and then went to the nearby Food Lion where he bought a jug of Clorox which he poured on the body to

cover up the odor and keep it from being discovered. Defendant said he previously included Sturdivant as a participant in the crime to get back at Sturdivant for telling the police that defendant had killed the victim.

Charges against Sturdivant were dropped the next day, and he was released.

Dr. John D. Butts, the chief medical examiner for the State of North Carolina, performed the autopsy on the body of Shelia Wall on 11 November 1995. He testified that the victim received thirty-four stab wounds to the body, five to the front and twenty-nine to the back, upper shoulder, and neck. Two injuries to the left lung and one to the aorta were inflicted from the back. The body cavity had filled with blood, indicating that the victim had been alive and her heart beating for some time after the infliction of the stab wounds. Additional stab wounds to the head penetrated the skull and may or may not have penetrated the brain. The victim also suffered an extensive fracture at the base of the right side of the skull consistent with a blunt-force injury from a heavy object. Dr. Butts concluded that the piece of wood found at the crime scene, or one like it, could have caused the fracture. Dr. Butts was unable to determine the order of the stab wounds in relation to the fracture of the skull but testified that if the stab wounds occurred before the fracture of the skull, the victim would have been conscious during some portion of the time during which the stab wounds were being inflicted. A cut on the victim's right thumb was consistent with a defensive wound.

The State also presented evidence concerning the murder of Wade Long committed by defendant in 1978 and brought forth details about the similarities between the 1978 and 1995 murders. The crimes, though separated by seventeen years, were committed within eight-tenths of a mile from one another in the Spencer area. Both victims had been stabbed multiple times in the back and neck with a knife. Defendant had in each instance used a piece of lumber or wood to inflict blunt-force injuries to the head, after which he had thrown the wood in the bushes. In each case defendant was later seen by police near the crime scene; and when questioned, he confessed to having killed the victims. In each case he pointed out the piece of wood he had used.

Defendant did not testify or offer any evidence during the guilt-innocence phase of the trial.

During the sentencing proceeding the State introduced copies of documents from defendant's prior convictions: assault with a deadly weapon with intent to kill in 1975 and the second-degree murder of Wade Long in 1978.

Defendant offered the testimony of several witnesses at his sentencing, including family members and friends. They testified that when defendant was released in 1991 from serving time in prison for the 1978 murder, he lived with his sister and her family for six or seven months, and then moved out when he could afford a place to stay. During this time defendant began to drink heavily. Prior to the killing of Shelia Wall, defendant was frequently depressed about their relationship and about his housing and job situations—at some point in 1995 he lost his job, and his landlord was angry because his mobile home had bats. Several witnesses testified that although he often drank, defendant was never angry or violent. Defendant's niece testified that defendant could not read but had not seemed embarrassed about taking someone with him to fill out job applications.

Dr. John Warren, an expert in forensic psychology, examined defendant and diagnosed alcohol abuse, cannabis abuse, cocaine abuse, low intellectual functioning, specific reading disability, and specific spelling disability. Warren also noted symptoms of depression and adjustment disorder. He testified that defendant showed remorse for killing Shelia Wall and that defendant was tearful when they discussed it.

## JURY SELECTION

[1] Defendant contends that the trial court erred in allowing the State's motions to excuse for cause two prospective jurors, Ms. Waller and Mr. Harris, and in not allowing the defense an opportunity to rehabilitate these prospective jurors.

Defendant argues that prospective juror Waller exhibited some equivocation about her ability to return a death verdict and that she did not have enough certitude on the subject to justify a challenge for cause. The transcript reveals that during *voir dire* by the prosecutor, Waller indicated three times that she had doubts about her ability to individually return a death verdict and that she did not think that she could do it. Upon questioning by the trial judge, she then stated unequivocally that she could not individually return a verdict of death. Defense counsel then questioned Waller and asked Waller whether she could follow the law and set aside her personal feelings

to impose the death penalty. She responded, "I would have to because I am under oath." The trial court then resumed questioning and received several unequivocal answers from Waller that she could not individually stand and render a verdict of death.

As for prospective juror Harris, defendant argues that Harris indicated only that he did not want to serve in general, rather than that he felt his beliefs made him unable under any circumstances to return a verdict of death. The transcript shows that Harris' daughter worked for the defense attorneys and that this fact caused him to have reservations about his ability to serve as an impartial juror: "All I know is my daughter has worked for Marshall [Bickett, lead defense counsel] and the other [defense] lawyer [Bays Shoaf] for the last year and two or three months . . . . She is their secretary or paralegal, whatever it is for some time." More importantly, however, Harris also indicated to the prosecutor that his beliefs about the death penalty were such that he "probably couldn't" return a verdict of death even if the law required it. When the trial judge questioned Harris, the following colloquy took place:

THE COURT: Is what you're saying is that there aren't any facts or any law that in any case would allow you to return a verdict of guilt or death?

MR. HARRIS: I don't think so. I don't—

THE COURT: Your opinion is that your view in this particular case would impair your ability to perform your duties as a juror?

MR. HARRIS: I would rather not be involved in this case. . . .

THE COURT: The question is do you think it would impair your ability as a juror in this particular case?

MR. HARRIS: To a certain degree it may.

THE COURT: Question is—will it or won't it?

MR. HARRIS: It probably would.

The trial court then granted the State's motion to excuse Harris for cause.

The standard for determining when a prospective juror may be excluded for cause on account of his or her views on capital punishment is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his

STATE v. HIPPS

[348 N.C. 377 (1998)]

instructions and his oath.' " *State v. Conaway,* 339 N.C. 487, 511, 453 S.E.2d 824, 839 (quoting *Wainwright v. Witt,* 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52 (1985)), *cert. denied,* 516 U.S. 884, 133 L. Ed. 2d 153 (1995). Whether to allow a challenge for cause in jury selection is a decision ordinarily left to the sound discretion of the trial court, and that decision will not usually be reversed on appeal except for abuse of discretion. *Id.*

In the instant case Ms. Waller's responses indicated that she could not return a verdict of death under any set of circumstances. Any equivocation she may have exhibited reflected not an actual ability to sentence defendant to death if the law required it, but only her desire to abide by her oath and follow the law. *See State v. Daughtry,* 340 N.C. 488, 508-09, 459 S.E.2d 747, 757 (1995), *cert. denied,* 516 U.S. 1079, 133 L. Ed. 2d 739 (1996); *State v. Yelverton,* 334 N.C. 532, 544, 434 S.E.2d 183, 190 (1993). Mr. Harris' responses likewise clearly indicated that his views on the death penalty would impair his ability to act as a juror in this case and that he could not return a verdict of death. Mr. Harris also had other additional impediments to his serving as an impartial juror. The trial court thus did not abuse its discretion in allowing the State's motion to excuse for cause either of these prospective jurors.

Defendant also argues that the trial court abused its discretion in not allowing the defense an opportunity to rehabilitate prospective jurors Waller and Harris. In Ms. Waller's case, the transcript reveals that the defense did attempt to rehabilitate the witness, albeit unsuccessfully. In Mr. Harris' case, the defense did not request to rehabilitate the witness. Where defendant fails to make any request to rehabilitate a prospective juror, he has failed to preserve for appellate review his contention that the trial court erred in failing to allow rehabilitation. *Conaway,* 339 N.C. at 512, 453 S.E.2d at 840. This assignment of error is overruled.

## GUILT-INNOCENCE

[2] Defendant next contends that the trial court committed prejudicial error in admitting testimony from witnesses Gwendolyn Fisher, Nicole Pittman, and Barbara Jennifer Gray that the victim had told them that she was afraid of defendant, that she was afraid he might kill her, and that the bruises and knots on her head during the summer and autumn of 1995 were caused by physical abuse from defendant.

**STATE v. HIPPS**

[348 N.C. 377 (1998)]

Defendant first argues that the victim's statements that she was afraid of defendant and that she was afraid that he might kill her were hearsay statements and that they were not admissible under the state of mind exception to the hearsay rule, N.C.G.S. § 8C-1, Rule 803(3) (1992). At trial Gwendolyn Fisher testified as follows on direct examination:

Q. Okay, over the period of time from when you first saw the bruises that you have described, up until the time—up until November 2nd, did you see bruises on her at other times?

A. Yes.

Q. How often did you see bruises on her?

A. It was getting to be almost a weekly thing I have seen them [sic.]

Q. Did she ever say to you whether or not she was afraid of the defendant in this case?

A. Yes.

Q. What did she say to you?

A. She said that things were getting worse and that she was getting—she was afraid of him, that something was missing in him. He didn't know how to love, things to that effect.

Q. Did she say what she was afraid what might happen to her?

A. She was afraid she was going to get killed.

Nicole Pittman testified as follows:

Q. Did Sheila [sic] Wall ever say anything to you about being afraid of [defendant]?

A. Yes.

Q. What did she tell you?

A. Well, when I asked her, you know, how she got [the lumps and bruises on her scalp] —

[DEFENSE COUNSEL]: Objection.

[PROSECUTOR]: I don't want you to say what she said about that, all right?

A. She said she was scared of him and that he might kill her.

Q. Did you ever—did she, after she told you that, did she say any-
thing to you about telling other people about that?

A. Yes, she told me not to tell because if he found out that she
told—

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

Q. What did she say?

A. She said that for—not to tell anybody because she was scared
that if anybody found out that she told that he would kill her.

Barbara Jennifer Gray testified as follows:

Q. Ms. Gray, let me back up and ask you a question. Did—at any
time when you saw a bruise or abrasion on her, did Sheila [sic]
Wall ever tell you whether or not she was afraid of [defendant]?

A. Yes.

Q. What did she say to you?

A. She just told me that—she had told me about whenever, all
right, not like the first bruise that happened, not then, but after-
wards after it started happening, she had told me that she was
afraid that [defendant] was going to kill her and I had, you know,
told her also she needed to get away way from him.

Evidence tending to show the state of mind of a victim is admis-
sible as long as the declarant's state of mind is a relevant issue and
the potential for unfair prejudice in admitting the evidence does not
substantially outweigh its probative value. *State v. Cummings*, 326
N.C. 298, 313, 389 S.E.2d 66, 74 (1990). This Court has consistently
held that a murder victim's statements that she fears the defendant
and fears that the defendant might kill her are statements of the vic-
tim's then-existing state of mind and are " 'highly relevant to show the
status of the victim's relationship to the defendant.' " *State v.
Crawford*, 344 N.C. 65, 76, 472 S.E.2d 920, 927 (1996) (quoting *State
v. Alston*, 341 N.C. 198, 230, 461 S.E.2d 687, 704 (1995), *cert. denied*,
516 U.S. 1148, 134 L. Ed. 2d 100 (1996)); *see also State v. McHone*, 334
N.C. 627, 636-38, 435 S.E.2d 296, 301-02 (1993), *cert. denied*, 511 U.S.
1046, 128 L. Ed. 2d 220 (1994); *State v. Lynch*, 327 N.C. 210, 220-24,
393 S.E.2d 811, 818-19 (1990); *State v. Cummings*, 326 N.C. at 312-13,
389 S.E.2d at 74. Defendant relies on *State v. Hardy*, 339 N.C. 207, 451

S.E.2d 600 (1994), for the proposition that this Court has "receded" from these well-established principles regarding the state of mind exception. In *Hardy* the victim had made diary entries which detailed assaults and threats against her by the defendant but which did not reveal the victim's state of mind or contain statements of fear by the victim. On this basis *Hardy* is distinguishable from the present case. Moreover, in *Hardy* the Court stated that "[s]tatements of a declarant's state of mind" such as " 'I'm frightened,' or, 'I'm angry,' " are excepted from the hearsay rule and admissible. *Id.* at 229, 451 S.E.2d at 612.

Whether the probative value of the victim's statements in this case is substantially outweighed by the danger of unfair prejudice to defendant is a matter left solely in the discretion of the trial court, and the trial court's decision will not be disturbed on appeal absent a showing of abuse of discretion. *Alston*, 341 N.C. at 231, 461 S.E.2d at 704. Here, defendant is not able to show that the trial court abused its discretion. We conclude that the trial court committed no error in admitting into evidence the statements of the victim that she was afraid of defendant and was afraid that he might kill her.

[3] Defendant next argues that the victim's statements that defendant beat her and gave her the bruises and knots on her head were not admissible under the state of mind exception and should have been excluded since they were more prejudicial to defendant than probative of any relevant fact. The record reflects that the prosecutor attempted to elicit testimony from witness Fisher that the victim had told Fisher that she received bruises from being struck by defendant. The trial court sustained defendant's objection and, outside the presence of the jury, heard arguments from both the prosecutor and defense counsel. The prosecutor argued that the victim's statements that her bruises came from being beaten by defendant are relevant to the issues of defendant's premeditation and deliberation and intent to kill and that the statements were admissible since they showed the victim's state of mind. Defendant argued that the statements did not show the state of mind of the victim. The trial court ruled that the testimony that the victim said her bruises were caused by blows from defendant was not admissible since it was hearsay and did not show the victim's state of mind and that the State must, therefore, limit the testimony of the witnesses to the state of mind evidence that the victim feared defendant. The prosecutor complied with this ruling while examining witness Fisher, carefully eliciting testimony only that the victim had bruises and knots on her head, that "things were getting

worse," that she was afraid of defendant, and that she was afraid she was going to get killed. The testimony from witness Pittman was likewise in compliance.

However, when examining witness Gray, the following colloquy took place:

Q. Ms. Gray, when did you first notice a bruise on her?

A. I can't tell you exactly what month it was, but I could tell you exactly what, you know, I know where it was located at and how she told me it got there and the reason why she got it.

Q. All right, then do that.

A. Okay. One day, Shelia had came home, which is at my mother's house, she had came home, and, you know, she had fat cheeks and so she had a bruise. I don't know which side of the cheek it was and I had asked her, I asked her myself. I said, "Shelia," I said, ["]what's wrong with you?" I said, "[W]hat's wrong with your face?" like that. At first, she didn't want to tell me and I keep on and on to her about, you know. I was really concerned, you know, about her and so she had told me that [defendant] had took his fist and hit her in the face.

[DEFENSE COUNSEL]: Objection.

THE COURT: Approach the bench.

(Conference held at the bench.)

THE COURT: Sustained. Don't consider the testimony as to him striking her at this point.

Q. Ms. Gray, let me back up and ask you a question. Did—at any time when you saw a bruise or abrasion on her, did Sheila [sic] Wall ever tell you whether or not she was afraid of [defendant]?

A. Yes.

Q. What did she say to you?

A. She just told me that—she had told me about whenever, all right, not like the first bruise that happened, not then, but afterwards after it started happening, she had told me that she was afraid that [defendant] was going to kill her and I had, you know, told her also she needed to get away way from him.

Q. All right. And in those times, in at least one of those times when she told you that she was afraid that he was going to kill her, did she also tell you where those bruises came from?

A. Yes, sir.

Q. What did she tell you?

A. She told me it came from [defendant].

Defendant lodged neither an objection to these last two questions by the prosecutor nor a motion to strike the answers of the witness.

Even assuming *arguendo* that defendant's earlier objection sufficed as an objection to these later questions and that the trial court erred in allowing the testimony, defendant has failed to show that the error was prejudicial. The evidence was overwhelming that defendant killed the victim. Several witnesses testified as eyewitnesses to an argument that defendant and the victim were having outside the Country Cupboard on the evening of 2 November 1995. At least one witness testified that the two were then seen walking down the road, the defendant walking directly behind the victim. Defendant confessed to having killed the victim, led police to the body, and pointed out to police one of the weapons he used to kill the victim. The autopsy corroborated defendant's statements. In light of this evidence, defendant cannot show that there is a reasonable possibility that the outcome of the trial would have been different if the trial court had excluded the statement of witness Gray that the victim's bruises were caused by defendant. *See* N.C.G.S. § 15A-1443(a) (1988).

Defendant next contends that various statements he made to police officers on 10 and 12 November 1995 were improperly admitted into evidence by the trial court since the statements were involuntarily given and obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694 (1966), and the federal and state Constitutions. The trial court conducted *voir dire* on the admissibility of defendant's statements and concluded in each instance that the statements were admissible. On appeal a trial court's findings of fact are binding if supported by competent evidence, but the question of voluntariness is a conclusion of law which is fully reviewable. *State v. Leary*, 344 N.C. 109, 117, 472 S.E.2d 753, 757 (1996). In this case we conclude that the trial court correctly admitted each of defendant's statements. We address each statement in turn.

**[4]** Defendant first argues that the trial court should have suppressed the statement he made to police at the railroad tracks on the morning of 10 November 1995 on the ground that defendant had not been advised of his constitutional rights pursuant to *Miranda* prior to being subjected to questioning by the police. Defendant does not argue precisely that he was in custody at this time, but merely that the words of the police officers were equivalent to an interrogation in that they were designed to elicit incriminating information and that the comments were "coercive" and "set the stage for defendant's later involuntary confession." On the morning of 10 November, while the officers were conducting their search for the victim in the woods near Burdette Bridge, Sergeant Wilhelm saw defendant, approached him, told him that they were searching for Shelia Wall, and asked defendant if he had seen her. Defendant responded that he had not seen her since Friday, 3 November, the week before. Wilhelm told defendant that the police had information that Ms. Wall had been killed and that he was the one who killed her and that if defendant did not kill her and she was alive, the officers needed to know. Wilhelm further told defendant that if the police found Ms. Wall dead, the police had enough evidence to arrest defendant for the murder. Defendant stated that if he saw her, he would bring Ms. Wall to the police. Sergeant Wilhelm then left defendant standing there while police continued to search in the woods.

The rule in *Miranda* applies only when a defendant is subjected to custodial interrogation. *State v. Gaines*, 345 N.C. 647, 661, 483 S.E.2d 396, 404, *cert. denied*, —— U.S. ——, 139 L. Ed. 2d 177 (1997). The term "custodial interrogation" is defined in *Miranda* as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444, 16 L. Ed. 2d at 706. To determine whether an encounter is custodial or noncustodial, we apply the objective test of whether a reasonable person in the defendant's position would have felt free to leave. *Gaines*, 345 N.C. at 662, 483 S.E.2d at 405.

The trial court held *voir dire* as to this particular statement by defendant and, based on the uncontradicted testimony, found that Sergeant Wilhelm received "no information from defendant as to where Shelia Wall was." The trial court did not address whether defendant was in custody at the time. The rule is "[i]f there is no material conflict in the evidence on *voir dire*, it is not error to admit the challenged evidence without making specific findings of

fact . . . . In that event the necessary findings are implied from the admission of the challenged evidence." *State v. Vick*, 341 N.C. 569, 580, 461 S.E.2d 655, 661 (1995). The record reveals that defendant's freedom to leave was in no way hampered when he was encountered by police at the railroad tracks and that a reasonable person in defendant's position would not have thought that he was in custody. We conclude that *Miranda* is not implicated by this noncustodial encounter and that the trial court did not err in admitting defendant's 10 November statement made to police by the railroad tracks.

[5] Defendant next argues that his statements to police later in the day on 10 November in the parking lot of Real's Variety store should have been suppressed since defendant was in custody and had not been given the *Miranda* warnings.

At *voir dire* on the admissibility of these statements, the evidence was not in conflict on the material facts. Accordingly, the trial court was not required to make findings of fact. *Id.* The undisputed evidence concerning defendant's statements was as follows: Sergeant Henline responded to a call on his radio about a disturbance at Real's Variety, possibly involving Rock Sturdivant or defendant or both. When Henline arrived at the store, he saw defendant standing outside. Henline asked defendant what was going on; and before he even got the words out, defendant came up and put his hands on the police car, saying, "Go ahead and take me. I did it." Henline backed defendant up off the vehicle and asked him, "What's going on? What are you talking about?" Defendant then said, "I did it. Me and Rock." Henline thought he was talking about the disturbance and asked, "What are you talking about?" Henline then heard defendant mumble something about "Shelia." Henline had been searching for Shelia Wall all morning pursuant to the missing-person report; and he testified that at this point in the conversation with defendant, he thought she was "going to walk out here on me in a minute and we're going to get everything cleared up." So Henline asked defendant, "[W]hat about Shelia, where's she at?" Defendant then responded, "[W]e killed her. She's under the bridge."

The trial court concluded as a matter of law that since defendant was not in custody when he made these statements and since they were voluntarily made, he did not have to be given his *Miranda* warnings. As stated above, *Miranda* warnings must be given only during custodial interrogation, and an encounter is custodial only if a reasonable person in the suspect's position would not feel free to leave. *Gaines*, 345 N.C. at 661-62, 483 S.E.2d at 404-05.

Given the facts of this encounter at Real's Variety, a reasonable person in defendant's position would not have thought he was in custody at the time he made the statement. Sergeant Henline, responding to a call of a disturbance, clearly did not know what defendant was talking about when he first encountered him in front of the store and tried to ascertain what was going on. Only after defendant said, "[W]e killed her. She's under the bridge," did the officer realize that defendant was talking about the Wall murder. Defendant was not in custody nor was he being interrogated by police when he made this statement. The facts here are analogous to those in *State v. Meadows*, 272 N.C. 327, 158 S.E.2d 638 (1968), where the officers were informed of a shooting and went to the scene to investigate. Upon arrival they saw the victim lying in a yard, bleeding from a gunshot wound to the neck. Several people were standing around; and when an officer asked the defendant what had happened, the defendant replied that he had shot the victim. When the officer asked why, the defendant explained; and when asked about the weapon, he led police to the shotgun he had used. *Id.* at 335, 158 S.E.2d at 643. The officer in that case testified concerning the encounter, "I didn't know what happened. When I got there—I asked him what happened and that's when he told me." *Id.* This Court held that the evidence had been properly admitted into evidence, inasmuch as no "in-custody interrogation" of the defendant had occurred since the defendant was not under arrest or in custody when he made the statement. *Id.* at 337, 158 S.E.2d at 645. Additionally, the Court in *Meadows* concluded that the police, who had arrived at the scene and were only trying to determine what was going on, were not interrogating, but were merely conducting an investigation to determine whether a crime had been committed. This Court stated:

> A general investigation by police officers, when called to the scene of a shooting, automobile collision, or other occurrence calling for police investigation, including the questioning of those present, is a far cry from the "in-custody interrogation" condemned in *Miranda*. Here, nothing occurred that could be considered an "incommunicado interrogation of individuals in a police-dominated atmosphere."

*Id.* at 337-38, 158 S.E.2d at 645 (quoting *Miranda*, 384 U.S. at 445, 16 L. Ed. 2d at 707). We find the reasoning in *Meadows* sound and applicable to the present case. Moreover, in this case, as in *Meadows*, when the officer arrived at the scene and asked questions to determine what was happening and whether a crime had been committed,

he did not know, nor should he have known, that his questions were likely to elicit an incriminating response. *See Vick*, 341 N.C. at 581, 461 S.E.2d at 662; *State v. McQueen*, 324 N.C. 118, 129, 377 S.E.2d 38, 44-45 (1989). Thus, the questions Sergeant Henline put to defendant at Real's Variety do not constitute interrogation for *Miranda* purposes.

Defendant attempts to broaden the factual scope of the encounter to include what happened after defendant made his statement in order to argue that the entire encounter was custodial. Defendant notes that directly after defendant made his statement, "[W]e killed her. She's under the bridge," defendant and Sergeant Henline got into the patrol car and went to the bridge. Defendant argues, based on this fact, that he was custodially detained while he made his statement.

What happened after the statement was made, however, does not affect the noncustodial and voluntary nature of the encounter prior to and while the statement was being made. *See State v. Hicks*, 333 N.C. 467, 479, 428 S.E.2d 167, 174 (1993) (encounter was noncustodial until the suspect gave a statement that he would "take responsibility" for a killing). Moreover, the facts show that defendant got into the car on his own, sat beside the officer in the front seat, was not handcuffed, and was not told he was under arrest or that he could not leave. We conclude that the trial court did not err in admitting into evidence the statement defendant gave to the police at Real's Variety.

Defendant next argues that his custodial statement to police at the station later that same day, 10 November 1995, and his statement made on 12 November at the detention center were inadmissible even though defendant had been given proper *Miranda* warnings in each instance and had waived his rights since the earlier unwarned statements were obtained in violation of his rights. Defendant urges the application of *State v. Hicks*, in which this Court set out the test for determining whether subsequent confessions should be suppressed when the initial confession is obtained in violation of a defendant's rights. *Id.* at 482, 428 S.E.2d at 175-76. We have concluded, however, that no *Miranda* violation occurred as to defendant's earlier statements; therefore, this argument necessarily fails.

[6] Defendant argues finally that the statements he gave and the written statements he signed after being properly advised of and waiving his rights should have been suppressed because his low IQ and impaired reading and spelling skills rendered him unable to under-

stand and knowingly waive his rights. Defendant contends that the trial court did not determine whether defendant actually understood his rights and what it meant to waive them and that the trial court thus failed to make an assessment of the voluntariness of the waivers and statements based on the totality of the circumstances. *State v. Massey,* 316 N.C. 558, 574, 342 S.E.2d 811, 821 (1986).

We do not find defendant's argument persuasive. The trial court was cognizant of defendant's limited intellectual and reading abilities and conducted extensive inquiry into the procedure used in obtaining defendant's waivers and statements. Defendant was reminded of his rights when he and Sergeant Henline reached the Burdette Bridge area on 10 November. After defendant showed the officers where the body was located, he was taken back to the police car, where Sergeant Wilhelm read defendant his rights from a rights card the officer kept in his car. Defendant orally indicated he understood his rights and then waived them before giving the officers more information about the crime. Later, when defendant was taken to the police station and given an opportunity to write his statement, defendant indicated that he did not write well and that he would like Sergeant Wilhelm to write it. Wilhelm wrote down each sentence as defendant spoke it and then read it back to defendant line by line, making corrections. Defendant initialed each correction and signed the statement. The trial court entered its findings of fact accordingly and concluded that defendant's rights were not violated; that he was not induced to waive his rights or make a statement; and that he freely, knowingly, intelligently, and voluntarily waived his rights and made his statements. We agree with the trial court's conclusions and note that these conclusions are further buttressed by the evidence presented by the State that defendant was familiar with his constitutional rights and the legal process based on his involvement with police in connection with his earlier murder conviction; in that case defendant had been advised of and waived his rights before giving a voluntary statement. Defendant's assignment of error is overruled.

**[7]** Defendant next assigns error to the trial court's denial of defendant's motion to suppress the oral statement he made on 10 November on the ground that the State failed to provide the statement to defense counsel during discovery in violation of N.C.G.S. § 15A-903(a)(1). Specifically, defendant notes that in response to his request for discovery documents from the State concerning both the oral and written statements made by defendant on 10 November, the prosecution provided a copy of the written statement and a summary

of the oral statement which indicated that the oral statement was substantially similar to the written one. Defendant complains that in the written statement, defendant stated to the police that he had used a "stick" to deliver the blows to the victim's head; but the testimony on *voir dire* concerning the oral statement was that defendant had used a "board." The defense argues that this *voir dire* was the first time defense counsel had heard anything about a "board" and that this undisclosed evidence resulted in unfair surprise and prejudice to defendant. Defendant maintains that the trial court abused its discretion in failing to sanction the prosecution and in failing to prohibit the introduction of the oral statement into evidence. We find defendant's contention to be without merit.

First, there was no discovery violation by the prosecution. Whatever term defendant used in his oral statement to describe the implement he used to deliver the blunt-force injury to the victim's head is immaterial in light of the fact that the object was identified at the scene of the crime, collected by investigators, studied by crime-scene specialists, introduced into evidence, and placed before the jury as State's exhibit number 13. Whether defendant called it a "stick" or "board," or, as it is also referred to at various points prior to the *voir dire* in question, a "railroad tie," a "piece of timber," a "piece of board," a "board," a "piece of wood," a "piece of railroad tie," a "log," a "timber," or a wooden object the dimensions of which are "twenty-nine and a half inches by three and a half inches by three inches," is of little consequence. Any variation in the terminology attributed to defendant's first statement was obviously caused by a natural confusion over what to call the object. The 10 November written statement states that defendant "got a stick and started hitting her in the head." As for the oral statement given earlier in the day on 10 November, however, Sergeant Wilhelm first testified that defendant picked up a "piece of wood" and started beating the victim in the head with it. Wilhelm then testified about the question he asked defendant and defendant's answer: " '[Y]ou picked up a stick and started beating her in the head with it?' He said, 'Yeah, I don't know why I did it, I just did it.' " Later on *voir dire* the following exchange occurred between the prosecutor and Sergeant Wilhelm:

Q. Did he also tell you what he did with the wood board or piece of wood?

A. Yes, sir, when he was standing there he told us. I said, "Well, where's the piece of wood?" and he pointed over to a large multi-

flora rose bush, which y'all call them briar bushes, flora rose bush, and in the very top of it, you couldn't see it to start with[,] this board.

Q. Is that State's Exhibit 13 that was later collected by Agent Bonds?

A. Yes, sir, it is.

On cross-examination by defense counsel, the following exchange took place:

Q. Did he say it was a stick that he hit her with and not a piece of wood or board?

A. I don't remember his exact—I can look it up in the statement, but I don't remember exactly.

Q. In the written statement, he says a stick and you're testifying now he said a board?

A. Well, he said a stick, but then he pointed [it out] to us and showed us where it was. In fact, he walked up to the bush and said, "That's it."

From these exchanges we conclude that Wilhelm referred to the object as a board because what he found on top of the bush where defendant indicated looked to him more like a board than a stick. The prosecution did not violate the discovery statute by representing to defense counsel that the 10 November oral statement was substantially similar to the 10 November written statement.

Even if there had been a discovery violation, the trial court did not abuse its discretion since it provided the defense with a recess to examine the evidence. Our General Statutes provide:

If at any time during the course of the proceedings the court determines that a party has failed to comply with this Article [Article 48, Discovery in Superior Court] or with an order issued pursuant to this Article, the court in addition to exercising its contempt powers may

(1) Order the party to permit the discovery or inspection, or

(2) Grant a continuance or recess, or

(3) Prohibit the party from introducing evidence not disclosed, or

(3a)  Declare a mistrial, or

(3b)  Dismiss the charge, with or without prejudice, or

(4)    Enter other appropriate orders.

N.C.G.S. § 15A-910 (1997). Defendant concedes that the decision as to which sanctions to apply or whether to apply any sanction at all rests in the discretion of the trial court. Defendant also concedes that the trial court may be reversed for an abuse of discretion only upon a showing that its ruling was so arbitrary that it could not have been the result of a reasoned decision. *State v. Quarg*, 334 N.C. 92, 103, 431 S.E.2d 1, 6 (1993). In this case the trial court did not abuse its discretion. The court denied the motion to suppress, finding that a violation had not occurred, but also granted the defense a recess to examine the evidence. The granting of a recess is one of the enumerated remedies a trial court is statutorily authorized to employ under N.C.G.S. § 15A-910. We note in addition that while defendant contends that he was denied sufficient time to prepare for the surprise evidence concerning the "board," defendant specifically declined the full use of the recess offered by the trial court and asked merely to look at the notes from which Sergeant Wilhelm testified. Defendant's assignment of error is overruled.

[8] Defendant next argues that the trial court committed error by admitting evidence of defendant's prior conviction for second-degree murder in violation of Rule 404(b) of the North Carolina Rules of Evidence. Defendant contends specifically that the evidence was not relevant to any permissible 404(b) purpose and that, instead, it tended to prove only that defendant possessed the character and disposition to commit the murder. Defendant also argues that the prior crime which occurred in 1978 was too remote in time to be relevant to any aspect of the present crime. Defendant maintains further that the error was prejudicial since the jury likely used the evidence for improper purposes. Rule 404(b) provides in pertinent part:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment, or accident.

N.C.G.S. § 8C-1, Rule 404(b) (Supp. 1997).

In interpreting this rule, this Court has said:

> This rule is "a clear general rule of *inclusion* of relevant evidence
> of other crimes, wrongs or acts by a defendant, subject to but *one*
> *exception* requiring its exclusion if its *only* probative value is to
> show that the defendant has the propensity or disposition to com-
> mit an offense of the nature of the crime charged." *State v.*
> *Coffey*, 326 N.C. [268,] 278-79, 389 S.E.2d [48,] 54 [(1990)]. The list
> of permissible purposes for admission of "other crimes" evidence
> is not exclusive, and such evidence is admissible as long as it is
> relevant to any fact or issue other than the defendant's propensity
> to commit the crime. *State v. Bagley*, 321 N.C. 201, 362 S.E.2d 244
> (1987), *cert denied*, 485 U.S. 1036, 99 L. Ed. 2d 912 (1988).

*State v. White*, 340 N.C. 264, 284, 457 S.E.2d 841, 852-53, *cert. denied*,
516 U.S. 994, 133 L. Ed. 2d 436 (1995).

The trial court in this case after *voir dire* made the following
findings of fact: (i) that in each case the victim suffered knife wounds
to the back and stomach and suffered blunt-force injury to the head;
(ii) that each assault occurred in an area where defendant was not
likely to be seen by others; (iii) that each victim's clothing was left
containing money; (iv) that following the death of each victim, offi-
cers observed defendant in the area where the body was found; (v)
that in each case defendant gave a statement to the investigating offi-
cers indicating that he had killed the victim; (vi) that in each case
defendant took the officers to the crime scene and pointed out the
pieces of wood which he said were used in the commission of the
murders. The trial court then concluded:

> [B]ased on the foregoing findings of fact, the Court finds that
> these cases are sufficiently similar to be admissible under our
> Rules of Evidence, that they are of the type made admissible by
> Rules of Evidence and they are relevant to some purpose other
> than showing the defendant's propensity for the type of conduct
> at issue; that the evidence is relevant and is to be received and
> considered only for the purpose of showing that the defendant
> had the intent required for first degree murder; that he knew that
> the stabbing and beating of Sheila Diane [sic] Wall would cause
> her death, and that he himself was capable of inflicting the
> wounds on Sheila [sic] Wall without the aid of anyone else. And
> further, that the probative value of this evidence . . . outweighs
> any prejudicial effect it may [have.] It is therefore, ordered that

the objection is overruled and [the evidence is] ruled to be admissible for these limited purposes.

We conclude that the evidence of the prior murder committed by defendant was properly admitted. The similarity of the two crimes is relevant to the present crime for reasons other than to show defendant's propensity to commit the crime. The manner in which the previous crime was committed tended to show that defendant had both knowledge and intent when he committed the crime for which he was being tried. The fact that defendant had previously killed a person in the same way demonstrated, as the prosecutor argued, that defendant knew what he was doing, knew that his actions would result in the victim's death, intended to kill the victim, and did not simply lose control.

Defendant argues nevertheless that since the prior crime occurred seventeen years before the present crime, it is too remote to be admissible under Rule 404(b). Remoteness for purposes of 404(b) must be considered in light of the specific facts of each case and the purposes for which the evidence is being offered. For some 404(b) purposes, remoteness in time is critical to the relevance of the evidence for those purposes; but for other purposes, remoteness may not be as important. For example, as this Court noted in *State v. Stager*, 329 N.C. 278, 406 S.E.2d 876 (1991), remoteness in time may be significant when the evidence of the prior crime is introduced to show that both crimes arose out of a common scheme or plan; but remoteness is less significant when the prior conduct is used to show intent, motive, knowledge, or lack of accident. *Id.* at 307, 406 S.E.2d at 893; *see also State v. Carter*, 338 N.C. 569, 588-89, 451 S.E.2d 157, 167-68 (1994) (remoteness not as critical when prior-acts evidence is admitted for purpose of proving identity), *cert. denied*, 515 U.S. 1107, 132 L. Ed. 2d 263 (1995); *State v. Riddick*, 316 N.C. 127, 134, 340 S.E.2d 422, 427 (1986) (remoteness more important when prior acts evidence is admitted to prove common plan or scheme rather than to prove *modus operandi*). In this case we conclude that the time lapse between the crimes goes to the weight of evidence, not to its admissibility. *See Carter*, 338 N.C. at 589, 451 S.E.2d at 168.

Defendant contends finally that the admission of the evidence of the prior murder was most likely used by the jury for improper purposes and that the danger of unfair prejudice far outweighed its probative value. We disagree. The determination of whether relevant evidence should be excluded under Rule 403 is a matter that is left in the

sound discretion of the trial court, and the trial court can be reversed only upon a showing of abuse of discretion. *State v. Pierce*, 346 N.C. 471, 490, 488 S.E.2d 576, 587 (1997). In this case defendant has not demonstrated any abuse of discretion by the trial court. On the contrary, a review of the record reveals that the trial court was aware of the potential danger of unfair prejudice to defendant and was careful to give a proper limiting instruction to the jury. Moreover, the evidence of the prior crime is highly probative of defendant's knowledge that his actions on 2 November 1995 would likely kill the victim and that he intended to kill the victim. We conclude, therefore, that defendant's assignments of error concerning the admission of this evidence are without merit.

## SENTENCING PROCEEDING

**[9]** Defendant next contends that the trial court erred in sustaining the prosecution's objection to a question posed to defendant's expert witness in forensic psychology. Defendant asserts that critical testimony was thus precluded; and as a direct result, the jury failed to find the (f)(6) statutory mitigating circumstance that the capacity of defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired. N.C.G.S. § 15A-2000(f)(6) (1997).

During the sentencing proceeding, defendant's counsel elicited from Dr. John Warren information concerning defendant's ability to make decisions and the effect of alcohol on defendant's ability to think. Dr. Warren opined that defendant's limited intellectual functioning and any substance abuse constituted diagnosable mental disturbances. Defendant's counsel then attempted to ask Dr. Warren the following question with respect to the (f)(6) mitigator, "Would he have the capacity to appreciate the criminality of his conduct and conform to the requirements of law as with most of your population in a given situation?" The trial court sustained the prosecutor's objection. After the objection was sustained, defendant's counsel did not rephrase the question or make an offer of proof as to how Dr. Warren would have answered; rather, he moved on to other areas of inquiry.

Defendant argues based on *State v. Beach*, 333 N.C. 733, 430 S.E.2d 248 (1993), that the trial court erred in sustaining the State's objection. The question posed to the expert witness in *Beach* tracked the language of the (f)(6) statutory mitigator. In this case the question contained the additional phrase, "as with most of your population in a given situation." Hence, defendant's reliance on *Beach* is misplaced.

STATE v. HIPPS

[348 N.C. 377 (1998)]

In order for a defendant to preserve for appellate review the exclusion of evidence, "a defendant must make an offer of proof as to what the evidence would have shown or the relevance and content of the answer must be obvious from the context of the questioning." *State v. Geddie,* 345 N.C. 73, 95-96, 478 S.E.2d 146, 157 (1996), *cert. denied,* —— U.S. ——, 139 L. Ed. 2d 43 (1997). " 'It is well established that an exception to the exclusion of evidence cannot be sustained where the record fails to show what the witness' testimony would have been had he been permitted to testify.' " *State v. Johnson,* 340 N.C. 32, 49, 455 S.E.2d 644, 653 (1995) (quoting *State v. Simpson,* 314 N.C. 359, 370, 334 S.E.2d 53, 60 (1985)).

Moreover, as the State notes, Dr. Warren also testified that "[w]hat I found was that his understanding of his world is limited because of his limited IQ, that any substance abuse is going to curtail that and decrease his understanding of those concepts and decrease his ability to control himself emotionally," and, "Yes, he does [know right from wrong], but it's a very elementary simple right from wrong. It's how what I do affects me rather than the bigger picture, community right or wrong." Hence, the jury had evidence before it from which it could have concluded that defendant's capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of law was impaired. Defendant's assignment of error is overruled.

**[10]** Defendant's next contention is that the trial court erred in overruling defendant's objection to the manner in which the prosecutor cross-examined defendant's expert witness. Defendant asserts that the prosecutor's questioning included improper statements of the prosecutor's own opinion of the witness' diagnosis of defendant and that these statements were prejudicial to defendant and deprived him of a fair trial.

During the sentencing proceeding, the following exchange occurred between the prosecutor and Dr. Warren:

Q. Okay. And what you were saying to this jury is that his answers [on three personality tests] showed so many symptoms of profound mental illness for which you found no other indications that none of the personality tests were valid; isn't that right?

A. No, not the way you word it. His answers showed so many symptoms and complaints that the test interpretation would not be valid because, as I said on direct, except for the most pro-

foundly mentally ill psychotic, crazy—to use a regular term—person, they wouldn't have that many symptoms, and I did not in my examination or that of my staff members, see that level of mental illness in him, so the tests scores being off the charts, not seeing that extent in the examination with him, the standard interpretation for those tests would not be valid. In other words, the tests would not be valid.

Q. So, to simplify this for us, he is not crazy, in your words?

A. I found no indication of psychosis or craziness. What I found was mental illness and substance abuse.

Q. He is not crazy, but he answered like he was crazy?

A. He answered saying that he had a large number of physical and mental symptoms.

Q. Okay. Now, crazy is the word. Could you answer that question yes or no?

A. No, I really can't. I answer—trying to explain to you and the jury so that you have a clear understanding of what I'm saying as opposed to putting it in a way that is not clear.

Q. Okay. Well, it seems abundantly clear to me if he is not crazy, he answered like he is crazy, he wasn't telling you the truth, but you say that's a cry for help?

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

A. I did not say he answered like he was crazy, and see, that's, I think, the way our misunderstanding is coming in as you interpret things and I'm trying to help you clarify. He answered endorsing a large number of symptoms on all three tests. This is very unusual, and in the literature is most often called a cry for help response pattern seen in very childlike and dependent people, which is consistent with this man's intelligence and background.

Defendant asserts that the trial court's failure to sustain defendant's objection to the prosecutor's question allowed the prosecutor to place before the jury his opinion that defendant was only acting "crazy" and was lying on the personality tests.

Concerning the cross-examination of expert witnesses, this Court has said:

"[The] North Carolina Rules of Evidence permit broad cross-examination of expert witnesses. N.C.G.S. § 8C-1, Rule 611(b) (1992). The State is permitted to question an expert to obtain further details with regard to his testimony on direct examination, to impeach the witness or attack his credibility, or to elicit new and different evidence relevant to the case as a whole. " 'The largest possible scope should be given," and "almost any question" may be put "to test the value of his testimony." ' 1 Henry Brandis, Jr., *Brandis on North Carolina Evidence* § 42 (3d ed. 1988) (footnotes omitted) (citations omitted)."

*State v. Gregory,* 340 N.C. 365, 410, 459 S.E.2d 638, 663-64 (1995) (quoting *State v. Bacon,* 337 N.C. 66, 88, 446 S.E.2d 542, 553 (1994), *cert. denied,* 513 U.S. 1159, 130 L. Ed. 2d 1083 (1995)) (alteration in original), *cert. denied,* 517 U.S. 1108, 134 L. Ed. 2d 478 (1996).

Applying this standard, we conclude that the prosecutor's questions were well within the bounds of proper cross-examination of an expert witness. The witness had stated that defendant gave the types of answers only a profoundly mentally ill, psychotic, or crazy person would have given, but that all other indications of defendant's mental status were that defendant was not profoundly mentally ill. The witness drew a conclusion from this disparity that defendant's responses constituted a cry for help. This conclusion was proper for the prosecutor to attack in order to impeach the credibility of the witness and his expert opinion. The prosecutor's questions were designed to elicit that another conclusion could be drawn from the facts, namely, that defendant was merely lying. The trial court did not err in overruling defendant's objection to the prosecutor's question; this assignment of error is overruled.

[11] Defendant next assigns error to the submission of the especially heinous, atrocious, or cruel aggravating circumstance, N.C.G.S. § 15A-2000(e)(9), asserting that the evidence does not support the submission of this aggravator. In *State v. Sexton* this Court identified several types of murders which warrant submission of the especially heinous, atrocious, or cruel circumstance. We said:

"One type includes killings physically agonizing or otherwise dehumanizing to the victim. *State v. Lloyd,* 321 N.C. 301, 319, 364 S.E.2d 316, 328[, *sentence vacated on other grounds,* 488 U.S. 807, 102 L. Ed. 2d 18] (1988). A second type includes killings less violent but 'conscienceless, pitiless, or unnecessarily torturous to the victim,' *State v. Brown,* 315 N.C. 40, 65, 337 S.E.2d 808,

826-27 (1985), [*cert. denied,* 476 U.S. 1164, 90 L. Ed. 2d 733 (1986), *overruled on other grounds by State v. Vandiver,* 321 N.C. 570, 364 S.E.2d 373 (1988),] including those which leave the victim in her 'last moments aware of but helpless to prevent impending death,' *State v. Hamlet,* 312 N.C. 162, 175, 321 S.E.2d 837, 846 (1984). A third type exists where 'the killing demonstrates an unusual depravity of mind on the part of the defendant beyond that normally present in first-degree murder.' *Brown,* 315 N.C. at 65, 337 S.E.2d at 827."

*State v. Sexton,* 336 N.C. 321, 373, 444 S.E.2d 879, 908-09 (quoting *State v. Gibbs,* 335 N.C. 1, 61-62, 436 S.E.2d 321, 356 (1993), *cert. denied,* 512 U.S. 1246, 129 L. Ed. 2d 881 (1994)), *cert. denied,* 513 U.S. 1006, 130 L. Ed. 2d 429 (1994). For purposes of determining the sufficiency of the evidence to support the submission of this aggravating circumstance to the jury, the trial court must consider the evidence in the light most favorable to the State; and the State is entitled to every reasonable inference to be drawn from the facts. *State v. Elliott,* 344 N.C. 242, 279, 475 S.E.2d 202, 219 (1996), *cert. denied,* —— U.S. ——, 137 L. Ed. 2d 312 (1997).

The evidence in this case, viewed in the light most favorable to the State, supported the submission of the especially heinous, atrocious, or cruel circumstance. Defendant stabbed the victim at least thirty-four times, primarily on her back, but also on the front of her body and her head. The knife wounds to the head penetrated the skull. Two stab wounds pierced the left lung, and three pierced the right lung. One wound penetrated the aorta and caused extensive bleeding into the chest cavity, indicating that the victim's heart was beating while she was being stabbed. The victim also suffered a fracture at the base of her skull from a blow or blows to the head with a piece of wood. Even if the trauma to the head rendered the victim unconscious, the evidence suggested that at least some of the stab wounds were inflicted prior to the blow to the head. The existence of a defensive wound on the victim's hand also suggests that the victim was conscious and aware of what was happening. Death was caused by the stab wounds. This evidence supports the conclusion that the victim's death was physically agonizing, conscienceless, pitiless, and unnecessarily torturous and that the victim was aware of, but helpless to prevent, her impending death. The trial court did not err by submitting this aggravating circumstance to the jury; defendant's assignment of error is overruled.

**[12]** Defendant next contends that the trial court erred by failing to intervene during two portions of the prosecutor's argument to the jury and by failing to instruct the jury to disregard those portions of the prosecutor's argument. Defendant concedes that he did not object at trial but contends that the argument was so grossly improper that the trial court abused its discretion in failing to intervene *ex mero motu*. In determining whether the prosecutor's argument was so grossly improper, this Court must examine the argument in the context in which it was given and in light of the overall factual circumstances to which it refers. *State v. Tyler*, 346 N.C. 187, 205, 485 S.E.2d 599, 609, *cert. denied*, —— U.S. ——, 139 L. Ed. 2d 411 (1997). "[T]he impropriety of the argument must be gross indeed in order for this Court to hold that a trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument which defense counsel apparently did not believe was prejudicial when he heard it." *State v. Johnson*, 298 N.C. 355, 369, 259 S.E.2d 752, 761 (1979).

Defendant first culls from the prosecutor's argument the exhortation that "[p]rison's been tried, it didn't work, and you've got a responsibility as a juror to go back and consider this." Defendant contends that this is analogous to an argument that the jury should impose the death penalty in order to set a standard of conduct and send a general message of deterrence to others who may commit crimes. Defendant maintains that this Court held such an argument to be grossly improper in *State v. Kirkley*, 308 N.C. 196, 215, 302 S.E.2d 144, 155 (1983), *overruled on other grounds by State v. Shank*, 322 N.C. 243, 367 S.E.2d 639 (1988). Initially, we note that defendant errs in his interpretation of the prosecutor's argument. A review of the transcript reveals that the prosecutor properly and permissibly argued that the jury should impose the death penalty to foreclose further crimes by defendant specifically. *See State v. Alston*, 341 N.C. at 251-52, 461 S.E.2d at 717; *State v. Zuniga*, 320 N.C. 233, 269, 357 S.E.2d 898, 920, *cert. denied*, 484 U.S. 959, 98 L. Ed. 2d 384 (1987). Moreover, defendant's reliance on *Kirkley* is misplaced. In *Kirkley* the prosecutor argued, "I'm asking you to impose the death penalty as a deterrent, to set a standard of conduct." We said that the prosecutor's argument was improper but held, since the defendant there had lodged no objection to the argument at trial, that the argument was not so grossly improper as to require *ex mero motu* intervention by the trial court. *Kirkley*, 308 N.C. at 215, 302 S.E.2d at 155.

**[13]** Defendant also takes exception to the prosecutor's statement to the jury that "the law requires that you return a jury recommendation

of death in this case," asserting that this statement constitutes a false proposition of law. Defendant, however, fails again to understand the prosecutor's argument in its proper context. The prosecutor was properly arguing that the recommendation of a death sentence was warranted by the facts and circumstances of this case; he did not make a "false proposition of law" by so arguing.

As defendant has failed to show any gross impropriety in the prosecutor's arguments to the jury, we overrule this assignment of error.

## PROPORTIONALITY

**[14]** In defendant's final assignment of error, he argues that the sentence of death in this case was imposed under the influence of passion, prejudice, or other arbitrary considerations, and that based on the totality of the circumstances, the death penalty is disproportionate. We are required by N.C.G.S. § 15A-2000(d)(2) to review the record and determine (i) whether the record supports the jury's findings of the aggravating circumstances upon which the court based its death sentence; (ii) whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; and (iii) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. *State v. McCollum*, 334 N.C. 208, 239, 433 S.E.2d 144, 161 (1993), *cert. denied*, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994).

After a thorough review of the transcript, record on appeal, and briefs and oral arguments of counsel, we are convinced that the jury's findings of the two aggravating circumstances submitted were supported by the evidence. We also conclude that nothing in the record suggests that defendant's death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor.

Finally, we must consider whether the imposition of the death penalty in defendant's case is proportionate to other cases in which the death penalty has been affirmed, considering both the crime and the defendant. *State v. Robinson*, 336 N.C. 78, 133, 443 S.E.2d 306, 334 (1994), *cert. denied*, 513 U.S. 1089, 130 L. Ed. 2d 650 (1995). The purpose of proportionality review is "to eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury." *State v. Holden*, 321 N.C. 125, 164-65, 362 S.E.2d 513, 537 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). Proportionality review also acts "[a]s a check against the capricious or random impo-

sition of the death penalty." *State v. Barfield*, 298 N.C. 306, 354, 259 S.E.2d 510, 544 (1979), *cert. denied*, 448 U.S. 907, 65 L. Ed. 2d 1137 (1980). Our consideration is limited to those cases within the pool which are roughly similar as to the crime and the defendant, but we are not bound to cite every case used for comparison. *State v. Syriani*, 333 N.C. 350, 400, 428 S.E.2d 118, 146, *cert. denied*, 510 U.S. 948, 126 L. Ed. 2d 341 (1993). Whether the death penalty is disproportionate "ultimately rest[s] upon the 'experienced judgments' of the members of this Court." *State v. Green*, 336 N.C. 142, 198, 443 S.E.2d 14, 47, *cert. denied*, 513 U.S. 1046, 130 L. Ed. 2d 547 (1994).

Defendant was convicted of first-degree murder based on premeditation and deliberation. The jury found both the submitted aggravating circumstances: (i) that defendant had previously been convicted of a felony involving the use of violence to the person, N.C.G.S. § 15A-2000(e)(3); and (ii) that the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9).

Three statutory mitigating circumstances were submitted for the jury's consideration: (i) the murder was committed while the defendant was under the influence of mental or emotional disturbance, N.C.G.S. § 15A-2000(f)(2); (ii) the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired, N.C.G.S. § 15A-2000(f)(6); and (iii) the catchall mitigating circumstance that there existed any other circumstance arising from the evidence which the jury deemed to have mitigating value, N.C.G.S. § 15A-2000(f)(9). The jury found that the murder was committed while defendant was under the influence of mental or emotional disturbance but declined to find either of the other two mitigators. Of the fifteen nonstatutory mitigating circumstances submitted, three were found by the jury.

We begin our analysis by comparing this case to those cases in which this Court has determined the sentence of death to be disproportionate. This Court has determined the death sentence to be disproportionate on seven occasions. *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *and by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373; *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983).

**STATE v. HIPPS**

[348 N.C. 377 (1998)]

In five of the seven cases in which this Court has concluded that the death penalty was disproportionate, the jury did not find the aggravating circumstance that the murder was especially heinous, atrocious, or cruel. *Benson*, 323 N.C. 318, 372 S.E.2d 517; *Rogers*, 316 N.C. 203, 341 S.E.2d 713; *Young*, 312 N.C. 669, 325 S.E.2d 181; *Hill*, 311 N.C. 465, 319 S.E.2d 163; *Jackson*, 309 N.C. 26, 305 S.E.2d 703. Since the jury in the present case found this statutory aggravating circumstance to exist, this case is easily distinguishable from those cases. As we have previously stated, "[w]hile this fact is certainly not dispositive, it does serve as an indication that the sentence of death . . . is not disproportionate." *State v. Walls*, 342 N.C. 1, 72, 463 S.E.2d 738, 777 (1995), *cert. denied*, 517 U.S. 1197, 134 L. Ed. 2d 794 (1996). The crime of defendant in this case, which included thirty-four stab wounds to the victim's body, additional stab wounds to the head, and a blunt-force trauma to the head, is equally as brutal as other murders where a death sentence was imposed. Additionally, there is evidence that the victim suffered before she died and that she was aware of but helpless to prevent her impending death. Dr. John D. Butts testified that the bleeding into the chest cavity indicated that the victim was alive and that her heart was still beating while she was being stabbed. The evidence further supports the inference that the blow to the head, which may or may not have produced unconsciousness, was delivered after the stab wounds. A cut to the victim's thumb was also indicative of a wound received while the victim was attempting to protect herself. That defendant was convicted of premeditated and deliberate murder is also significant. "The finding of premeditation and deliberation indicates a more cold-blooded and calculated crime." *State v. Artis*, 325 N.C. 278, 341, 384 S.E.2d 470, 506 (1989), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990).

In the other two cases in which we have concluded that the death penalty was disproportionate, the jury did find that the murders were especially heinous, atrocious, or cruel. *Stokes*, 319 N.C. 1, 352 S.E.2d 653; *Bondurant*, 309 N.C. 674, 309 S.E.2d 170. However, both cases are distinguishable from the present case on other grounds.

In *Stokes* the Court emphasized that the defendant was found guilty of first-degree murder based upon the felony murder rule; that there was little, if any, evidence of premeditation and deliberation; and that the defendant was seventeen years old at the time of the murder and acted in concert with a considerably older co-felon. 319 N.C. at 21, 24, 352 S.E.2d at 664, 666. In the instant case, on the other

hand, defendant was forty-six years old at the time of the murder, acted alone, and was found guilty of first-degree murder on the basis of premeditation and deliberation.

In *Bondurant* the defendant shot the victim but then immediately directed the driver of the car in which they had been riding to proceed to the emergency room of a hospital. In concluding that the death penalty was disproportionate, we focused on the defendant's immediate attempt to obtain medical assistance for the victim and the lack of any apparent motive for the killing. In contrast, the evidence in the present case tended to show that defendant covered the victim's body with tree limbs, poured bleach on the body to retard the smell and prevent discovery, and then laughed at the police as he watched them searching for days for the woman reported missing by her family.

Another distinguishing characteristic of this case is that two aggravating circumstances were found by the jury. Of the seven cases in which this Court has found a sentence of death disproportionate, in only two, *Bondurant*, 309 N.C. 674, 309 S.E.2d 170, and *Young*, 312 N.C. 669, 325 S.E.2d 181, did the jury find the existence of multiple aggravating circumstances. *Bondurant*, as discussed above, is clearly distinguishable. In *Young* this Court focused on the failure of the jury to find the existence of the "especially heinous, atrocious, or cruel" aggravating circumstance, which the jury found in the present case. Moreover, the jury in the present case found as an aggravating circumstance that defendant had been previously convicted of a violent felony. This finding is significant and reflects upon defendant's character as a recidivist. *See State v. Warren*, 347 N.C. 309, 328, 492 S.E.2d 609, 619 (1997), *cert. denied*, —— U.S. ——, 140 L. Ed. 2d 818 (1998). There are four statutory aggravating circumstances which, standing alone, this Court has held sufficient to sustain death sentences; the (e)(3) and (e)(9) aggravators, both of which were found in this case, are among them. *Bacon*, 337 N.C. at 110 n.8, 446 S.E.2d at 566 n.8.

Although we review all of the cases in the pool when engaging in this statutory duty, as we have repeatedly stated, it is worth noting again that "we will not undertake to discuss or cite all of those cases each time we carry out that duty." *McCollum*, 334 N.C. at 244, 433 S.E.2d at 164. We conclude that the present case is more similar to certain cases in which we have found the sentence of death proportionate than to those in which we have found the sentence dispro-

portionate or those in which juries have consistently returned recommendations of life imprisonment.

Accordingly, we conclude that defendant received a fair trial, free from prejudicial error, and that the sentence of death recommended by the jury and ordered by the trial court in the present case is not disproportionate.

NO ERROR.

Justice WEBB concurring in the result.

I concur in the result reached by the majority but I believe evidence that the defendant had committed a murder seventeen years previously should have been excluded pursuant to N.C.G.S. § 8C-1, Rule 404(b).

The majority says this evidence was admissible to prove intent and was thus not barred as evidence showing the defendant's propensity to commit the crime with which he is charged in this case. The majority says this is so because, "The fact that defendant had previously killed a person in the same way demonstrated . . . that defendant knew what he was doing, knew that his actions would result in the victim's death, intended to kill the victim, and did not simply lose control."

The evidence showed the victim had thirty-four stab wounds to the body, stab wounds to the head that penetrated the skull, and an extensive fracture at the base of the skull. It is inconceivable to me that on this evidence it was necessary to show the defendant had previously committed murder in order to prove he knew his action would cause the death of the victim. The defendant is bound to have known that his action would cause the victim's death.

The evidence of the previous murder was of no probative value in proving the defendant's intent. It was probative of the defendant's propensity to commit murder. It should have been excluded.

Because of the strong evidence against the defendant, I am satisfied there is not a reasonable possibility that there would have been a different result had this error not occurred. I would hold it is harmless error.